******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# EH INVESTMENT COMPANY, LLC
## *v.* CHAPPO LLC ET AL.
### (AC 38693)

Prescott, Beach and Bishop, Js.

*Syllabus*

The plaintiff real estate development company sought return of a deposit
it had paid to the defendant company and its principal, claiming that
the defendant company had breached an agreement to find a lender
willing to make a commercial loan to the plaintiff for purposes of
redeeming a foreclosed commercial office property that it owned. The
plaintiff had been leasing the foreclosed property to H Co. and informed
the defendants that H Co. was considering whether to renew or extend
its lease. The plaintiff sent the defendants a memorandum containing
the specifics of the proposed lease with H Co., which was subject to
the approval of H Co.'s senior management. The defendants prepared
an engagement letter detailing that they would procure a lender that
would provide financing for the plaintiff in accordance with the loan
terms that were detailed in the engagement letter. The plaintiff agreed
to pay the defendants a placement fee of 1 percent of the principal loan
amount from the proceeds of the closing and, upon execution of the
engagement letter, the plaintiff would wire the defendants one half of
the placement fee as an engagement deposit. With respect to that deposit,
the letter stated that, in the event the defendants were unable to provide
a lender commitment, the deposit would be returned to the plaintiff,
but the defendants would retain the deposit if the plaintiff failed to
complete financing after they had provided a lender commitment. Fur-
thermore, the letter concluded with a merger clause that provided that
the terms of the letter superseded all of the parties' prior understandings.
The plaintiff wired the deposit to the defendants and returned the exe-
cuted engagement letter. The defendants found a lender that would
supply a loan according to the terms in the engagement letter and sent
the plaintiff a loan application that would become the lender commit-
ment letter after being returned and signed by the lender. The plaintiff,
however, failed to sign and return the loan application because it had
not secured a lease extension with H Co. After the defendants refused
to return the deposit, the plaintiff commenced its action for, inter alia,
breach of contract premised on the defendants' alleged wrongful reten-
tion of the deposit. The trial court rendered judgment in part for the
plaintiff, concluding that the lease renewal with H Co. was a condition
precedent to the parties' contract, and that because the condition prece-
dent was not met, the plaintiff had no duty to perform and, therefore,
the defendants breached the parties' contract by failing to return the
deposit. The court also found that the defendants had exercised owner-
ship over the plaintiff's property to the plaintiff's detriment and, there-
fore, the retention of the deposit also constituted a conversion. On
appeal, the defendants claimed, inter alia, that the trial court improperly
found that they had breached the contract because the lease renewal
with H Co. was not a condition precedent, the absence of which man-
dated a return of the deposit, and the only obligation they undertook
pursuant to the contract's plain and unambiguous terms was to find a
lender that was willing to fund a loan according to the terms of the
engagement letter. *Held* that the trial court improperly construed the
parties' contract as including the H Co. lease extension as a condition
precedent to the parties' obligations that required the defendants to
return the deposit: there was no indication that the trial court gave
proper deference to the language of the parties' fully integrated contract,
which clearly and unambiguously provided that the defendants were
entitled to keep the deposit if they obtained a loan commitment in
accordance with the plaintiff's proposed terms and the loan failed to
close; moreover, it was undisputed that, at the time the parties entered
into their agreement, the plaintiff had not yet secured a lease extension
with H Co. and, therefore, this was not a situation where the parties
failed to fully contemplate the occurrence or nonoccurrence of the lease

extension, and, if the plaintiff had viewed its lease with H Co. as an indispensable part of its agreement with the defendants, the plaintiff could have insisted that obtaining the lease extension be made a clear and express condition on its duty to compensate the defendants, or that the defendants would return the deposit in the event that the lease extension never materialized; furthermore, because the plaintiff was the party that had assumed the risk of engaging a loan broker before it had obtained the necessary lease commitment from H Co. to secure the loan, it was improper for the trial court to shift that risk from the plaintiff to the defendants by rewriting the parties' contract.

Argued March 7—officially released July 4, 2017

(Appeal from Superior Court, judicial district of Fairfield, Hon. Michael Hartmere, judge trial referee.)

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the defendants filed a counterclaim; thereafter, the matter was tried to the court, *Hon. Michael Hartmere*, judge trial referee; judgment in part for the plaintiff on the complaint and judgment for the plaintiff on the counterclaim; subsequently, the court denied the defendants' motion to reargue, and the defendants appealed to this court; thereafter, this court denied the plaintiff's motion to dismiss the appeal. *Reversed in part; judgment directed.*

*Scott D. Brenner*, for the appellants (defendants).

*Robert R. Lewis*, for the appellee (plaintiff).

*Opinion*

PRESCOTT, J. The defendants, Chappo LLC and its principal, Richard J. Chappo, appeal from the judgment of the trial court rendered in favor of the plaintiff, EH Investment Company, LLC, on those counts of the complaint alleging breach of contract by Chappo LLC and conversion by both defendants.[1] The court determined that the defendants, whom the plaintiff had engaged to find a lender willing to make a commercial loan that the plaintiff needed in order to redeem a foreclosed office building it had owned, improperly refused to return the plaintiff's deposit after the plaintiff informed them that it would be unable to proceed with a loan because it had not obtained a lease extension from the building's primary tenant, the proceeds from which were intended to service the debt on the loan. The trial court determined that the existence of an executed lease with the tenant was a condition precedent to the parties' loan procurement contract, the nonoccurrence of which excused the plaintiff's performance and required Chappo LLC to return the plaintiff's deposit. The court awarded the plaintiff total damages of $47,500, the amount of the deposit.

The defendants claim on appeal that the trial court improperly determined that the existence of a lease extension was a condition precedent to the parties' contract. According to the defendants, the terms of the parties' contract were memorialized in a written engagement letter drafted by Chappo, and Chappo LLC successfully performed its only duty under the parties' contract by successfully finding a lender willing to make a loan on the terms sought by the plaintiff as set forth in the engagement letter. Further, they contend that because the engagement letter unambiguously set forth express terms governing the disposition of the engagement deposit, which did not include any provision requiring Chappo LLC to return the deposit if the plaintiff was unable to obtain a lease after Chappo LLC procured a commitment from a lender, they were entitled to keep the plaintiff's deposit. For the reasons that follow, we agree with the defendants. Accordingly, we reverse in part the judgment of the trial court and remand the case to that court with direction to render judgment in favor of the defendants on the breach of contract and conversion counts. The remainder of the judgment is affirmed.

The relevant facts underlying this appeal are set forth by the court in its memorandum of decision and, generally, are not disputed.[2] The plaintiff is a real estate development company. Its principal, Fred Gordon, is a real estate investor and developer who holds a master's degree in business administration, in addition to being a practicing attorney. Gordon conducts his business from Bloomfield Hills, Michigan. Chappo also has an master's degree in business administration and has

worked for more than thirty years in financing and real estate. His business, Chappo LLC, is located in Connecticut and specializes in arranging financing for corporate properties. Prior to entering into the business transaction now at issue, Gordon and Chappo were familiar with each other from Chappo's earlier experiences in investment banking, and the two men had communicated on several occasions over a twelve year period about financing opportunities for various properties.

In November, 2012, Gordon spoke with Chappo by phone regarding a 94,000 square foot commercial office building located on a twelve acre property in Auburn Hills, Michigan. The plaintiff previously owned that property, but recently had lost title to a bank in foreclosure proceedings after having defaulted on a loan obligation. The plaintiff had leased the building to Huntsman Corporation (Huntsman), which remained the building's primary tenant. Two years remained on the original lease. Gordon informed Chappo that Huntsman was considering whether to renew or extend the lease. Gordon wished to obtain financing in order to redeem the property from the bank,[3] but indicated to Chappo that, due to the distressed state of Michigan's economy, many lenders would not consider financing property there, especially foreclosed property.

Over the next few weeks, Gordon and Chappo continued to discuss by phone or by e-mail details of a potential financing deal for the property, which included details of the plaintiff's efforts to negotiate a lease extension with Huntsman as well as general information about the property market in Auburn Hills. In an e-mail dated November 15, 2012, Gordon sent Chappo a memorandum that contained specifics of the proposed Huntsman lease. The proposed lease was to run for a period of fifteen years and have an annual lease rental value of $1,220,000. Around the same time, Gordon also sent a memorandum to the executives at Huntsman who were handling lease negotiations with the plaintiff, in which he indicated that the plaintiff hoped to obtain a commitment to a lease extension, subject to Huntsman senior management approval, by early January, 2013, in order to permit the plaintiff to obtain a refinancing commitment from a lender. Gordon informed Chappo that any lease with Huntsman would need the approval of Huntsman senior management. As succinctly explained by the trial court, "Gordon's plan was to finance the [redemption] price of the property after [the plaintiff] had defaulted on the existing loan at enough savings that, if he could get [Huntsman] to agree to extend the lease under terms similar to those then in existence, the plaintiff would gain a windfall profit of approximately $5 million."

The defendants subsequently began working on obtaining the financing sought by the plaintiff. To that

end, Chappo prepared an engagement letter dated November 20, 2012, that "included all the terms of the loan and indicated that [Chappo LLC] had an exclusive engagement to procure a lender which would then provide financing for a single tenant property occupied by [Huntsman] in accordance with the terms outlined in the engagement letter." Those terms, as the trial court indicated, included "that the tenant would be [Huntsman] and that the lender would be an institutional lender, that the term of the loan would be ten years, that the principal amount would be $9,500,000 at an interest rate of 5.25 percent, and that debt service would be based on a twenty year amortization." Lease payments would be made by Huntsman directly to the lender to service the debt, with any excess returned to the plaintiff. The engagement letter also contained a detailed description of the property, set forth basic terms of the as yet unrealized Huntsman lease extension,[4] and indicated that the lender would receive a first mortgage security interest in the property. The closing and funding of the loan were to occur approximately thirty days from the date of the lender commitment.

Pursuant to the engagement letter, the plaintiff agreed to pay Chappo LLC a "[p]lacement [f]ee" equal to $95,000, 1 percent of the principal amount of the note, to be paid out of the proceeds when the loan closed. The plaintiff also agreed that, upon executing the engagement letter, it would wire Chappo LLC an "[e]ngagement [d]eposit" equal to one half of 1 percent of the principal amount of the proposed $9,500,000 note, or $47,500. The engagement letter contained the following language directly pertaining to the return or retention of the engagement deposit: "In the event Chappo LLC is unable to provide a [l]ender commitment as stipulated above and such time frame is not extended, the [e]ngagement [d]eposit will be returned to the [b]orrower. Chappo LLC will retain the deposit if the [b]orrower fails to provide requested information in a timely manner or fails to complete the financing after Chappo LLC had provided a [l]ender commitment." Importantly, the penultimate paragraph of the engagement letter provided as follows: "It is understood and agreed that the terms of this [e]ngagement shall supersede any and all prior [e]ngagements, arrangements or understandings among the parties with respect to the subject matter discussed above."

On January 4, 2013, the plaintiff executed the engagement letter and delivered it to the defendants. Attached to the executed engagement letter was a memorandum from Gordon that stated as follows: "Enclosed is an executed copy of the engagement letter for the Huntsman property. The deposit of $47,500 will be wire transferred. The deposit will be returned within five days of the time at which it appears a loan pursuant to the application is not probable of funding by February 28, 2013, or an agreed later funding date. Looking forward

to the expedited loan closing."

Gordon later wire transferred $47,500 to Chappo LLC.[5] As previously noted, Gordon also made changes directly on the engagement letter because he was still in the process of negotiating the exact terms of the lease extension with Huntsman. See footnote 4 of this opinion. The defendants did not respond or object to the changes made by Gordon on the executed engagement letter or to the language in the accompanying memorandum.

On January 10, 2013, the defendants e-mailed the plaintiff portions of a loan application from a lender, American National Insurance Company (American National). Gordon, finding the terms acceptable, completed the relevant pages and returned them to the defendants within hours. After receiving the returned pages of the application, an investment officer from American National "circulated the complete application/commitment letter to [the] investment committee and the senior vice president with authority to commit to the loan. The final version of the mortgage loan application was e-mailed to Gordon on January 22, 2015, with a hard copy [sent] direct from American National . . . the following morning. On the formal application was a signature block for Gordon and for the senior vice president of American National, Scott F. Brast. As soon as Gordon signed and returned the original, Brast would countersign, and the document would become the commitment letter. The application/commitment letter included all the terms specified by Gordon's engagement letter as well as an agreement by American National to fund by February 28, 2013, the date needed by Gordon."

Section 4.4 of the application/commitment letter provides: "At the time of closing, Applicant will have entered into a lease or leases and/or lease guarantees, the terms and conditions of which are to be approved by Lender, with a tenant or tenants and lease guarantors approved by Lender, to occupy 94,000 square feet with an annual rental from such lease or leases to produce no less than $1,183,000." The document also provided that American National approved Huntsman for occupancy and as lease guarantors.

The plaintiff, however, would not execute the application/commitment letter because it did not have an executed lease agreement with Huntsman, and it surmised that American National would never approve and fund the loan without the extended Huntsman lease as security. From late January, 2013, through mid-February, 2013, there was "a paucity of communication" between the parties. Although American National expressed some concern to the defendants that it might no longer be able to fund the transaction within the requisite time frame, Gordon continued to tell the defendants that he was waiting to hear from Huntsman about executing

the lease extension, although he actually was still negotiating with Huntsman about the terms of the lease.

As set forth by the trial court, "Huntsman had retained . . . a real estate services organization to represent it in negotiations regarding the proposed lease renewal. Gordon informed Chappo that the lease advisor informed Huntsman that the terms which Gordon was seeking were too generous to the [plaintiff] and that Huntsman was not offering [the plaintiff] the terms which Gordon had outlined to Chappo. Gordon then informed Chappo that he was working with the original lender . . . to extend the redemption date deadline of the foreclosure by consent. On March 1, 2013, Gordon sent a memorandum to [the original lender] stating that a tentative lease agreement had been concluded with Huntsman satisfactory to the lender of the redemption funding and that all of the redemption loan documentation had been completely negotiated and prepared. Gordon had been negotiating a separate transaction with a separate lease extension involving a separate lender." The defendants continued to believe that they could broker successfully the deal between American National and the plaintiff. Chappo contacted the investment officer from American National, who presented the transaction to its investment committee. The committee subsequently voted to go forward with the loan.

Nevertheless, on March 3, 2013, the plaintiff advised the defendants that "based on current circumstances we are withdrawing the [a]pplication."[6] The plaintiff requested that the defendants return the engagement deposit. The defendants refused, citing the engagement letter's exclusivity clause, which the defendants posited the plaintiff had breached by negotiating directly with another lender.

On December 29, 2013, the plaintiff commenced the underlying action. The complaint contained five counts, all premised upon the defendants' alleged wrongful retention of the engagement deposit. Count one alleged breach of contract by Chappo LLC, count two alleged statutory theft against both defendants,[7] count three alleged that the defendants were liable for conversion, count four alleged that the defendants breached the implied covenant of good faith and fair dealing, and count five alleged that the defendants' actions amounted to a violation of the Connecticut Unfair Trade Practices Act (CUTPA). See footnote 1 of this opinion.

The defendants filed an answer that denied the material allegations of the complaint, raised a special defense of fraud, and alleged two counterclaims against the plaintiff sounding in fraud and breach of contract. The plaintiff filed a response in which it denied the allegations in the special defense and counterclaims.

The matter was tried to the court, *Hon. Michael Hartmere*, judge trial referee, on May 13 and May 14, 2015.

Gordon and Chappo were the only witnesses to testify. The parties each submitted posttrial memoranda.

The plaintiff argued in relevant part that the defendants had no legitimate basis for retaining the engagement deposit because Chappo knew from the outset that the entire transaction at issue was predicated on Huntsman executing a lease renewal with the plaintiff, and Chappo acknowledged at trial that no lender would commit to funding a loan without the lease as security. The plaintiff further argued that obtaining the lease was not a promissory obligation undertaken by the plaintiff as suggested by the defendants. Rather, the existence of a lease was a condition precedent, the failure of which voided the contractual obligations of the parties and, thus, obligated the return of the deposit.

In their posttrial briefs, the defendants invoked the doctrine of prevention in defense of the breach of contract allegations, arguing that the plaintiff was not entitled to a return of the deposit because, despite Chappo LLC's having found a lender who was willing to provide a loan to the plaintiff in accordance with all the terms specified in the engagement letter, the plaintiff refused to sign and return the application/commitment, thus preventing the execution of a formal commitment letter. Further, the defendants argued that the lease extension with Huntsman was never a condition of the agreement to secure a lender's commitment, but only a condition of ultimately funding the loan. The loan could have proceeded if a lease with terms more favorable to Huntsman could have been negotiated.

On October 29, 2015, the court issued a memorandum of decision. The court found in favor of the plaintiff on the breach of contract and conversion counts, but in favor of the defendants on the remainder of the complaint. The court reasoned that the Huntsman lease renewal was a condition precedent to the parties' contract and that, because that condition was never met, the plaintiff had no duty to perform and was entitled to the return of its deposit. The court found that the defendants' failure to return the deposit constituted a breach of contract by Chappo LLC, and, because the defendants exercised "ownership over the plaintiff's property to the plaintiff's harm," the defendants' retention of the deposit also amounted to a conversion.

The court nevertheless found that the plaintiff had failed to establish the necessary larcenous intent on the part of the defendants to establish the elements of a statutory theft. Further, the court found that the plaintiff failed to demonstrate that the defendants' actions were done in bad faith or were immoral, unethical, and unscrupulous so as to support, respectively, the plaintiff's counts alleging breach of the implied covenant of good faith and fair dealing or a CUTPA violation. Because the defendants failed to brief their special defense and counterclaims, the court deemed them

abandoned.[8]

The defendants filed a motion to reargue and for reconsideration on November 18, 2015. The court denied that motion on December 2, 2015. This appeal followed.[9]

The defendants claim on appeal that the trial court improperly determined that Chappo LLC breached its contract with the plaintiff by failing to return the engagement deposit.[10] The defendants argue that, although obtaining a lease extension from Huntsman might have been integral to the plaintiff's ability to close on the loan commitment secured by Chappo LLC, the existence of a lease was not, under the express terms of the parties' contract, a condition the absence of which mandated a return of the engagement deposit. The plaintiff agreed to compensate Chappo LLC from the proceeds realized at the closing of a loan, assuming Chappo LLC was able to secure a loan commitment. The deposit requirement reasonably can be viewed as a means to protect the defendants in the event that they secured a commitment but the loan failed to close through no fault of their own. In other words, the deposit signaled the parties' intent to allocate a large portion of the risk that a lease extension or alternative security for the loan would never materialize to the party that was in control of the lease negotiations: the plaintiff. The defendants assert that because Chappo LLC found a lender that was willing to commit to fund a loan on the terms agreed upon, which was the only obligation it undertook pursuant to the plain and unambiguous terms of the parties' contract, the defendants had a right to retain the deposit in accordance with the express terms of the engagement letter despite the fact that a loan never actually closed. We agree and conclude that the court improperly construed the parties' contract as requiring a return of the deposit.

Because the defendants' claim challenges the court's interpretation of the parties' contract, particularly its having construed the contract as containing a condition precedent, we begin our analysis by setting forth the applicable standard of review and general principles of law relevant to the construction of contracts. "The law governing the construction of contracts is well settled. When a party asserts a claim that challenges the trial court's construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous." (Internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 13, 938 A.2d 576 (2008). "If a contract is unambiguous within its four corners, intent of the parties is a question of law requiring plenary review. . . . [If] the language of a contract is ambiguous, the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous." (Internal quotation marks omitted.)

*Assn. Resources, Inc.* v. *Wall*, 298 Conn. 145, 183, 2 A.3d 873 (2010). "A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . Accordingly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . .

"[W]e accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. . . . [If] the language is unambiguous, we must give the contract effect according to its terms. . . . [If] the language is ambiguous, however, we must construe those ambiguities against the drafter. . . . Moreover, in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." (Citations omitted; internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, supra, 285 Conn. 13–14.

In ascertaining the intent of contracting parties, we are also mindful that a court's interpretation of a contract must also be informed by whether the terms of the contract are contained in a fully integrated writing. This is important because "[t]he parol evidence rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract. . . . The parol evidence rule does not apply, however, if the written contract is not completely integrated." (Citation omitted; internal quotation marks omitted.) *Benvenuti Oil Co.* v. *Foss Consultants, Inc.*, 64 Conn. App. 723, 727, 781 A.2d 435 (2001).

An integrated contract is one that the parties have reduced to written form and which represents the full and final statement of the agreement between the parties. See id., 728–29. Accordingly, an integrated contract must be interpreted solely according to the terms contained therein. Whether a contract is deemed integrated oftentimes will turn on whether a merger clause exists in the contract. Id., 728. The presence of a merger clause in a written agreement establishes conclusive proof of the parties' intent to create a completely integrated contract and, unless there was unequal bargaining power between the parties, the use of extrinsic evidence in construing the contract is prohibited. See *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 502–504, 746 A.2d 1277 (2000).

"We long have held that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit

oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. . . . Although there are exceptions to this rule, we continue to adhere to the general principle that the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 502–503; see also 2 Restatement (Second), Contracts § 204, comment (e), p. 98 (1981) ("[w]here there is complete integration and interpretation of the writing discloses a failure to agree on an essential term, evidence of prior negotiations or agreements is not admissible to supply the omitted term"). Courts must always be mindful that "parties are entitled to the benefit of their bargain, and the mere fact it turns out to have been a bad bargain for one of the parties does not justify, through artful interpretation, changing the clear meaning of the parties' words." 13 R. Lord, Williston on Contracts (4th Ed. 2000) § 38:13, p. 427.

Because the court interpreted the parties' contract as containing an unmet condition precedent, a brief discussion of the legal parameters of contractual conditions is necessary. "A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. . . . A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. . . . If the condition is not fulfilled, the right to enforce the contract does not come into existence. . . . Whether a provision in a contract is a condition the nonfulfillment of which excuses performance depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances when they executed the contract." (Citations omitted.) *Lach* v. *Cahill*, 138 Conn. 418, 421, 85 A.2d 481 (1951); see also 2 Restatement (Second), supra, § 224, p. 160 ("[a] condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due").

Conditions precedent can be either express or implied. 8 C. McCaulif, Corbin on Contracts (J. Perillo ed., Rev. Ed. 1999) § 30.10, p. 19. An express condition precedent is one that springs from language in the contract and qualifies one or both parties' rights or duties of performance. Id., § 30.7, o. 14, § 30.10, p. 19. Although not strictly required, parties often signal their agreement to create an express condition precedent by using words such as "on [the] condition that," "provided that," unless and until, or "if." (Internal quotation marks omitted.) 2 Restatement (Second), supra, § 226, comment (a), p. 170. In addition to express conditions prece-

dent, a condition precedent may be implied or "supplied by the court," often in circumstances in which the court determines that the contracting parties have failed to foresee or recognize the significance of an event or its potential effect on the parties' rights. See id., § 204, comments (b) and (d), pp. 97–98.

Interpreting a contract as containing an implied condition precedent, however, is disfavored if the result will be a forfeiture of compensation or other benefit, especially if that forfeiture falls on a party who had no control over whether the condition or event would occur. This principle is aptly reflected in § 227 of the Restatement (Second), supra, p. 174, which provides in relevant part: "In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk." As explained in the commentary of the rule, "[if] the nature of [a] condition is such that the uncertainty as to [an] event will be resolved before either party has relied on its anticipated occurrence, both parties can be entirely relieved of their duties, and the obligee risks only the loss of his expectations. [If], however, the nature of the condition is such that the uncertainty is not likely to be resolved until after the obligee has relied by preparing to perform or by performing at least in part, he risks forfeiture. If the event is within his control, he will often assume this risk. If it is not within his control, it is sufficiently unusual for him to assume the risk that, in case of doubt, an interpretation is preferred under which the event is not a condition." 2 Restatement (Second), supra, § 227, comment (b), pp. 175–76. Thus, whereas the policy favoring freedom of contract would require that an *express* condition precedent be honored even though a forfeiture would result, if "it is doubtful whether or not the agreement makes an event a condition of an obligor's duty, an interpretation is preferred that will reduce the risk of forfeiture." Id., p. 175. The Restatement (Second) further posits that even in those cases in which the court finds a condition precedent exists, "[t]o the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." 2 Restatement (Second), supra, § 229, p. 185.

Turning to the defendants' claim, we first conclude that the language of the engagement letter is unambiguous and, therefore, the intent of the parties is a question of law. We agree with the defendants that the court improperly construed the parties' contractual agreement as intending the occurrence of a Huntsman lease extension as a condition precedent of the parties' contractual obligations such that the nonoccurrence of

the lease extension completely excused the plaintiff's performance and required the defendants to return the plaintiff's engagement deposit. In particular, as we will discusse further, the court in this case did not determine whether the parties' contract was a fully integrated writing between commercial entities with equal bargaining power and, thus, entitled to stricter adherence to its express terms; did not state as part of its analysis whether the express contractual provisions regarding the retention or return of the deposit were ambiguous, inapplicable, or insufficient to resolve the parties' dispute; did not identify what contractual language, provision, or extrinsic evidence the court relied upon in determining that obtaining a lease extension was a condition precedent of the contract; and, perhaps most importantly, did not address whether its construction of the contract would result in a forfeiture of compensation by Chappo LLC, despite the fact that Chappo LLC had no involvement in or control over the lease negotiations. After considering these factors, we conclude that the court improperly construed the parties' contract and incorrectly determined that Chappo LLC had breached that contract and wrongfully retained the plaintiff's deposit.

We note at the outset that there is no indication that the court gave proper deference to the language of the parties' contract, which was a fully integrated writing. The court determined, and we agree, that a valid contract was formed between the parties as memorialized in the engagement letter. Likewise, there is no disagreement that the terms of that contract also included the modifications that Gordon made at the time he signed the engagement letter on behalf of the plaintiff, both the changes he made to the executed engagement letter as well as the additional language in his accompanying memorandum. Pursuant to the contract, Chappo LLC promised to obtain a commitment from a lender willing to fund a loan on the terms supplied by the plaintiff in the contract, and, in exchange for that promise, the plaintiff agreed to pay Chappo LLC a commission equal to 1 percent of the loan from the proceeds at closing. The plaintiff also agreed to provide Chappo LLC with a deposit equal to roughly one half of the expected commission.

In its analysis of the breach of contract claim, the court makes no mention of the paragraph in the engagement letter that, in legal effect, amounted to a merger clause. That paragraph provided that "the terms of this [e]ngagement shall supersede any and all prior [e]ngagements, arrangements or *understandings among the parties with respect to the subject matter discussed above.*" (Emphasis added.) The inclusion of this merger clause was prima facie evidence that the parties intended their written agreement to encompass "the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing."

(Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 502. Although the court notes that Chappo drafted the engagement letter "with full knowledge that the lease extension had not been executed," the court did not find nor does the record disclose any imbalance in the parties' bargaining power. Both Gordon and Chappo are highly educated and familiar with these types of financial transactions, and, as evidenced by the changes that Gordon made to the engagement letter at the time he executed the contract, Gordon fully was capable of protecting the interests of the plaintiff. Rather than construe the language used by the parties, the court appears to have looked beyond the plain language of the agreement in deciding that the Huntsman lease was a condition precedent to any and all performance under the contract.

Certainly, at the time the parties entered into their agreement, it is undisputed that the plaintiff had not yet secured a lease extension from Huntsman and that all parties were aware of that fact. Negotiation of the lease was ongoing at that time. Accordingly, this is not a situation where the parties failed to fully contemplate the occurrence or nonoccurrence of a particular event. Despite the uncertainty surrounding the lease, and likely because the window of time for redeeming the property was quickly closing, the plaintiff decided to enter into the agreement with Chappo LLC to find a lender that would be willing to commit to financing the plaintiff's redemption of the property under the assumption that a lease renewal would be executed prior to closing. The defendants had no part in negotiating that lease, which was entirely the responsibility of the plaintiff. The plaintiff had all the information necessary to gauge the likelihood of retaining Huntsman as a lessee or whether some alternative contingency for servicing the loan debt was possible, such as modifying the terms of the proposed lease or securing a different tenant altogether. Because Chappo LLC had no actual control over whether the plaintiff would be able to negotiate a new lease with Huntsman, the plaintiff was the party best situated to evaluate the risk that Chappo LLC would expend resources in obtaining a lender only to have the loan unable to close.

To that end, if the plaintiff viewed the Huntsman lease as an indispensable part of its agreement with Chappo LLC, the plaintiff could have insisted that obtaining the lease be made a clear and express condition on its duty to compensate Chappo LLC for its efforts in obtaining a loan commitment. Alternatively, the plaintiff could have insisted that the engagement letter provide that Chappo LLC would return the deposit in the event that a lease never materialized. Instead, there is nothing in the parties' agreement that shifts any potential risk of the failure to obtain a lease from the plaintiff to Chappo LLC.[11]

Rather, the contract is clear and unambiguous that if Chappo LLC obtained a loan commitment in accordance with the plaintiff's proposed terms, and the loan failed to close, Chappo LLC was entitled to keep the deposit. Although, by agreement, the loan had to close in order for Chappo LLC to earn its full commission, and the loan almost certainly would not close without the intended lease with Huntsman, a notion that the defendants readily admit, nothing in the language of the parties' agreement expressly made obtaining the lease a condition precedent to the retention of the deposit. Chappo LLC simply had to secure the required loan commitment, which it did.[12]

Certainly, if it is clear from the facts and circumstances surrounding the making of a contract that the parties had failed to set forth expressly some condition that needed to exist before the parties' duty to perform under the contract ripened, a court has the authority to recognize and give effect to such an implied condition. In construing a fully integrated written contract, however, drafted and executed by sophisticated commercial parties, the court should be particularly wary before construing the contract to include an implied condition precedent, especially when supplying such a term will result in one of the parties forfeiting the benefits of his performance.

It is true that, pursuant to the engagement letter, Chappo LLC agreed to be compensated from the proceeds generated by the loan's closing, and, thus, Chappo LLC accepted some risk that, should the loan fail to close, it would not be entitled to the full benefit of the bargain. Nevertheless, Chappo LLC also ensured that that risk was partially set off by requiring the plaintiff to provide a deposit. Pursuant to the engagement letter, Chappo LLC was required to return the deposit only if it failed to secure a loan commitment, which we have concluded did not occur here. Here, if we were to accept the court's construction of the parties' contract as containing an unmet condition precedent, this would result in a forfeiture of compensation to Chappo LLC, which had substantially performed its duties under the contract.

The fact that the loan was unlikely to close due to circumstances outside the control of the defendants did not change the nature of the business arrangement between the plaintiff and Chappo LLC. Chappo LLC kept its promise to find the plaintiff a lender willing to finance on the agreed upon terms. The plaintiff was the party that, hoping to net approximately $5 million, had assumed the risk of engaging a loan broker before it had obtained the necessary lease commitment from Huntsman to secure a loan. It was incorrect for the court to rewrite the parties' contract in such a way as to shift that risk from the plaintiff to Chappo LLC.

The judgment is reversed in part and the case remanded with direction to render judgment in favor of the defendants on the breach of contract and conversion counts. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The trial court rendered judgment in favor of the defendants on the remaining counts of the complaint. Those counts, directed at both defendants, alleged statutory theft pursuant to General Statutes § 52-564, breach of the covenant of good faith and fair dealing, and a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110 et seq. The plaintiff has not appealed or cross appealed from those aspects of the court's judgment.

[2] In their appellate brief, the defendants assert that, for purposes of this appeal, they do "not dispute or seek to reverse the trial court's findings . . . with regard to the facts, and focus this appeal instead on the conclusions of law and judgment entered . . . ."

[3] Under Michigan law, real property owners whose interest have been foreclosed have between six and twelve months in which to exercise their right of redemption. See Mich. Comp. Laws §§ 600.3140 (1) and 600.3240.

[4] As noted by the court, "[t]he lease originally was to commence in November, 2012, but Gordon changed that [term on the executed engagement letter] to [March, 2013], with a term ending October 31, 2024. The lease was a triple net lease in which there are no landlord responsibilities. The lease payments Gordon [also] had corrected to be $1,183,000 for the first sixty-two months and $1,130,000 for the remaining term."

[5] There was no requirement in the agreement that the deposit be held in escrow or in a segregated account, and, accordingly, it was deposited into Chappo LLC's general operating account.

[6] The record reflects that after title to the property fully vested in the foreclosing bank it reached a new lease agreement with Huntsman. The bank then later sold the property to a third party subject to the Huntsman lease.

[7] The complaint contains a typographical error, referring to General Statutes § 52-54, rather than General Statutes § 52-564. Section 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

[8] The defendants have not challenged that portion of the court's judgment in the present appeal.

[9] The plaintiff filed a motion to dismiss the appeal as untimely on the basis of a handwritten notation on the court's memorandum of decision indicating that notice of the court's decision had issued on October 28, 2015. The plaintiff argued that if the initial appeal period began to run on October 28, 2015, the defendants' November 18, 2015 motion for reconsideration was filed one day after the appeal period had expired and, as a result, the present appeal was untimely. See Practice Book § 63-1. The date stamp on the memorandum of decision, however, as well as the electronic docket, indicate that the court's memorandum was not filed with the court until October 29, 2015. We denied the plaintiff's motion to dismiss.

[10] As noted, the court also ruled in favor of the plaintiff on its conversion count on the basis of its determination that the defendants wrongfully retained and exercised control over the deposit after the plaintiff asked the defendants to return those funds. The defendants also challenge that aspect of the court's judgment. Our resolution of the appeal in favor of Chappo LLC on the breach of contract count, however, logically also requires a reversal on the conversion count against the defendants. "Conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." *Discover Leasing, Inc.* v. *Murphy*, 33 Conn. App. 303, 309, 635 A.2d 843 (1993). If the defendants were entitled to retain the deposit, they did not exercise unauthorized control over the plaintiff's funds. Accordingly, we limit our discussion to the breach of contract count.

[11] The plaintiff argues that the Gordon memorandum is a part of the parties' contract, and that the following language was intended to further condition Chappo LLC's duty to return the deposit in the event that a loan could not close: "The deposit will be returned within five days of the time at which it appears a loan pursuant to the application is not probable of funding by February 28, 2013, or an agreed later funding date." The defendants do not contest that the parties' contract includes the Gordon memorandum. They argue, however, that the provision in question should be construed as clarify-

ing the last date on which a loan could fund in order to allow the plaintiff time to redeem the property and, accordingly, provides a specific time frame for the return of the engagement deposit should Chappo LLC be unable to obtain a commitment to fund by that date. In other words, the Gordon memorandum did not contain any new condition with respect to the return of the deposit but, as with the other changes Gordon made to the engagement letter, merely clarified an existing term in light of the state of events at the time he executed the engagement letter. In this case, it clarified the existing provision requiring Chappo LLC to return the deposit "[i]n the event Chappo LLC is unable to provide a [l]ender commitment as stipulated above and such time frame is not extended . . . ." To the extent that the language in the Gordon memorandum is susceptible of two meanings, it should be read in conjunction with the contract as a whole and consistent with other terms. See *C & H Electric, Inc.* v. *Bethel*, 312 Conn. 843, 853, 96 A.3d 477 (2014). We are simply unpersuaded that any language in the Gordon memorandum supports in any way the court's determination that a Huntsman lease extension was a condition precedent of the parties' agreement or that the failure of the lease negotiations mandated that the defendants return the engagement deposit, the only compensation the defendants received for their work.

[12] The record before us shows that Chappo LLC found a lender, American National, that was fully committed to providing a loan to the plaintiff on the terms specified in the engagement letter including the as yet unattained Huntsman lease. The plaintiff suggests that Chappo LLC nevertheless failed to fully perform because it never obtained a duly executed commitment letter. The defendants counter that the only hindrance in obtaining the formal commitment letter from American National was Gordon's refusal to sign the application, and the doctrine of prevention prohibits a party from taking advantage of any failure in performance that the party acted to hinder. We find it unnecessary to engage in such analysis, however, for two reasons. First, the language of the contract required only "a [l]ender commitment" not a formal commitment letter from a lender. Second, even if a formal letter was necessary, because Chappo LLC had found a willing lender and all that remained to secure a formal commitment was the signing of the application, there was substantial performance.

"The doctrine of substantial performance shields contracting parties from the harsh effects of being held to the letter of their agreements. Pursuant to the doctrine of substantial performance, a technical breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been committed is immaterial." (Internal quotation marks omitted.) *Mastroianni* v. *Fairfield County Paving, LLC*, 106 Conn. App. 330, 340–41, 942 A.2d 418 (2008). Accordingly, Chappo LLC substantially performed all of the obligations it undertook to perform pursuant to the parties' contract.

---