# CENTERPLAN CONSTRUCTION COMPANY, LLC, ET AL. *v.* CITY OF HARTFORD
## (SC 20526)

Robinson, C. J., and D'Auria, Kahn, Ecker and Suarez, Js.

*Syllabus*

The plaintiffs, C Co. and D Co., which had contracted with the defendant, the city of Hartford, to construct a baseball stadium, appealed from the judgment of the trial court in favor of the city. The city had entered into an agreement with an architectural firm, P Co., to design the stadium. After P Co. began work, the city, in February, 2015, entered into a development agreement with D Co. whereby D Co. would serve as the developer and administer and complete P Co.'s plans. In turn, C Co. and D Co. entered into a builder agreement with each other, and they both entered into a direct agreement with the city. In May, 2015, the city assigned its agreement with P Co. to C Co. and D Co. In December, 2015, a dispute arose between the parties. C Co. and D Co. claimed that they had never been given control over P Co. or its design of the stadium,

343 Conn. 368 MAY, 2022 369

Centerplan Construction Co., LLC *v.* Hartford

and that the scope of the project had increased because of design changes made by the city and the team that would be occupying the stadium. The city and D Co. resolved the dispute in January, 2016, by executing a term sheet that increased the budget for the project and extended the substantial completion deadline from March 11 to May 17, 2016. The term sheet, which C Co. did not sign, also prevented changes to the project without the city's consent and modified the liquidated damages provision in the city's agreement with D Co. After C Co. and D Co. failed to meet the extended substantial completion deadline, the city terminated its contractual relationship with C Co. and D Co. on the grounds that C Co. and/or D Co. had failed to construct the ballpark in a workmanlike manner and to pay the city liquidated damages that had accrued since their failure to substantially complete the project. C Co. and D Co. thereafter brought the present action against the city, claiming that the city had breached its contracts with them by failing to provide them with notice and an opportunity to cure the alleged defaults before terminating their contractual relationship. The city filed a counterclaim, alleging breach of contract against C Co. and breach of the implied covenant of good faith and fair dealing against C Co. and D Co. Prior to trial, and in response to various motions filed by the parties, the trial court determined that the city's contracts with C Co., D Co., and P Co. granted the city the right to approve the architectural plans and changes to them but granted C Co. and D Co. the right to control how the plans were carried out, including control over P Co. and responsibility for P Co.'s errors and omissions. The court further determined that the city's agreement with D Co. vested the city with the right of commercially reasonable approval over the project plans but that it was the parties' intention that D Co. would have complete control over the stadium design and construction. With respect to the assignment of the city's agreement with P Co. to C Co. and D Co., the court determined that C Co. and D Co. were able to present evidence at trial only as to the city's interference with their legal control over P Co. and the stadium's design after the term sheet was executed. The court instructed the jury that the only issue for it to decide was who was to blame for the stadium's not being ready by the May 17, 2016 deadline. The jury found C Co. and D Co. responsible for failing to complete the stadium by the contractually agreed on deadline, returned a verdict against C Co. and D Co. on their breach of contract claim against the city, and awarded the city $335,000 in liquidated damages in connection with its counterclaim. The trial court rendered judgment for the city, and C Co. and D Co. appealed. *Held*:

1. D Co. did not waive its right to contest errors by the city that occurred prior to the execution of the term sheet, including any architectural or design errors over which the city previously had control; accordingly, the trial court improperly precluded D Co. from presenting evidence of such errors and pursuing the claims against the city that it was entitled to pursue under the term sheet.

Centerplan Construction Co., LLC *v.* Hartford

2. The parties plainly and unambiguously provided in their agreements that, until the city assigned the agreement that it had with P Co. to C Co. and D Co., the city maintained legal control of and responsibility for P Co.'s work, including any errors or omissions that occurred between February and May, 2015; the city's assignment of its agreement with P Co. in May, 2015, to C Co. and D Co. would have been superfluous if C Co. and D Co. already had legal control of and responsibility for P Co.'s work prior to that assignment, and the assignment's recitals comported with the understanding that it was the parties' intent that there would be a subsequent assignment to C Co. and D Co. of the agreement between the city and P Co.

3. The clear language of the city's assignment of its agreement with P Co. to C Co. and D Co. plainly and unambiguously provided that C Co. and D Co. had legal control of and responsibility for P Co. and the stadium design upon the execution of that assignment in May, 2015, until January, 2016, when the term sheet was executed, including responsibility for any design errors committed during that time period; contrary to the trial court's determination, however, the assignment's plain and unambiguous language established that the city retained all obligations as to P Co. arising out of P Co.'s services before the assignment in May, 2015, including responsibility for any of P Co.'s errors or omissions before May, 2015.

4. This court determined that it was unclear under the term sheet whether the city, on the one hand, or C Co. and D Co., on the other, had control of P Co. and the stadium design after the execution of the term sheet in January, 2016, until June, 2016, when the city terminated its contractual relationship with C Co. and D Co.; accordingly, that issue was to be determined by the fact finder on remand.

5. The term sheet did not unambiguously divest C Co. of the right, in its agreement with D Co., to notice and an opportunity to cure any default prior to termination, the issue of whether the city improperly failed to provide C Co. with the required notice and cure period was a question of fact for the fact finder, and the city and C Co. should have been permitted to introduce evidence regarding whether the city gave C Co. notice and an opportunity to cure prior to terminating their contractual relationship:

   a. Although the city gained the right under the term sheet to remove C Co., without first terminating D Co., in the event that C Co. failed to meet the substantial completion deadline, the term sheet was ambiguous as to whether the right to remove C Co. was a newly created, unqualified right or involved the assignment to the city of D Co.'s preexisting right that D Co. had under its agreement with C Co.; however, under either interpretation of the term sheet, C Co. had an implied common-law right or a contractual right to notice and an opportunity to cure, as the term sheet did not unambiguously divest C Co. of such a right, and, accordingly, the trial court incorrectly determined that the term sheet did not

Centerplan Construction Co., LLC *v.* Hartford

require the city to provide C Co. with notice and an opportunity to cure prior to termination.

b. The city could not prevail on its claim that, even if C Co. had been given an opportunity to cure, it could not establish that it would have achieved substantial completion of the project within the allotted cure period, as it was the city's burden, rather than that of C Co., to demonstrate that providing an opportunity to cure would have been futile or that C Co.'s breach was incurable; because the trial court's ruling with respect to this issue was improper and the court did not present the issue to the jury, the parties were prevented from developing the record, and the case was remanded for further development of the record and a determination by the fact finder with respect to that issue.

c. The record was inadequate to determine whether C Co. ratified the term sheet, as the trial court made no preliminary finding of fact regarding ratification, and, thus, the parties did not have the opportunity to offer evidence on this issue, but the issue of whether C Co. ratified the term sheet must be addressed on remand only if the fact finder determines that the term sheet granted the city a newly created right to terminate C Co. for failing to meet the substantial completion deadline; accordingly, on remand, the fact finder must first determine whether the term sheet granted the city that newly created right or assigned to the city a preexisting right under D Co.'s agreement with C Co., and, if it determines that the term sheet granted the city a newly created right, it then must determine whether C Co. ratified the term sheet; moreover, if the fact finder determines that C Co. did ratify the term sheet, which C Co. would have to have done to consent to its requirements, the scope of the trial on remand would be limited to claims that arose after the execution of the term sheet in January, 2016.

Argued April 26, 2021—officially released May 24, 2022

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the Complex Litigation Docket; thereafter, the defendant filed a counterclaim; subsequently, the court, *Moukawsher, J.*, granted the defendant's motions to add Centerplan Development Company, LLC, et al. as third-party counterclaim defendants and the plaintiffs' motion to implead Pendulum Studio II, LLC, et al. as third-party defendants; thereafter, the defendant withdrew the counterclaim as to third-party counterclaim defendant Leyland Alliance, LLC, et al.; subsequently, the court

Centerplan Construction Co., LLC *v.* Hartford

granted in part the defendant's motion to preclude certain evidence and the case was tried to the jury before *Moukawsher, J.*; verdict and judgment in part for the defendant, from which the plaintiffs and third-party counterclaim defendant Centerplan Development Company, LLC, et al. appealed to the Appellate Court; thereafter, the court, *Moukawsher, J.*, denied the plaintiffs' motion for remittitur and ordered the discharge of notices of lis pendens on certain of the defendant's real properties, and the plaintiffs and third-party counterclaim defendant Centerplan Development Company, LLC, et al. filed an amended appeal; subsequently, the appeal was transferred to this court. *Reversed*; *new trial*.

*Louis R. Pepe*, with whom was *Laura W. Ray*, for the appellants (plaintiffs and third-party counterclaim defendant Centerplan Development Company, LLC, et al.).

*Leslie P. King*, with whom, on the brief, were *Sylvia H. Walbolt*, pro hac vice, *James E. Parker-Flynn*, pro hac vice, and *Ryan D. Class*, for the appellee (defendant).

*Opinion*

D'AURIA, J. The case before us involves a dispute over the party responsible for delays in constructing Dunkin Donuts Park, home of Hartford's minor league baseball team, the Yard Goats, and a key part of the planned economic revitalization of Connecticut's capital city. As often occurs with such projects, the parties blame one another for the delays. The dispositive issue in this appeal is whether the trial court correctly concluded, as a matter of law, that the plaintiffs, the project's developer, DoNo Hartford, LLC (DoNo), and the project's design-builder, Centerplan Construction Company, LLC (Centerplan), "controlled" the architect and were therefore responsible for any mistakes in and

Centerplan Construction Co., LLC *v.* Hartford

changes to the stadium's design.[1] Specifically, the plaintiffs claim that, in its pretrial interpretation of various agreements the plaintiffs and the defendant, the city of Hartford (city), had executed to construct the ballpark, the trial court incorrectly concluded that the agreements plainly had assigned to the plaintiffs both the power to direct the design of the ballpark as well as the responsibility for the architect's errors and omissions. After the trial court's ruling, a jury found the plaintiffs responsible for failing to complete the stadium by the contractually agreed on deadline, returned a verdict against the plaintiffs on their claim against the city, and awarded the city $335,000 in liquidated damages on its counterclaim.

Upon our careful review of the contracts at issue, we conclude that, contrary to the trial court's pretrial ruling, the parties' contracts did not unambiguously grant the plaintiffs legal control of the architect and the stadium's design across all relevant time periods. Because the trial court's pretrial ruling improperly took several questions of fact from the jury's consideration, we must

---

[1] The plaintiffs advance four additional claims on appeal: (1) Did the trial court err in deciding as a matter of law that, under the parties' agreements, the city did not breach its agreements with the plaintiffs by terminating Centerplan without affording it an opportunity to cure? (2) Did the trial court err in refusing to instruct the jury that, if it found that there was concurrent delay by virtue of the city's acts or omissions, Centerplan would be entitled to an extension of time and DoNo could not be in default? (3) Did the trial court err by directing the jury to award liquidated damages to the city without allowing it to consider offsetting the benefit conferred by the plaintiffs on the city? (4) Did the trial court err in discharging the lis pendens filed by DoNo and its counterclaim defendant affiliates, the leaseholders, on the parcels surrounding the ballpark? Because we have concluded that the plaintiffs' first issue disposes of their appeal and requires a new trial, we would not, in the ordinary course, need to reach these other issues. We have determined, however, that the issue of whether the city, as a matter of law, breached its agreements with the plaintiffs by terminating Centerplan without affording it an opportunity to cure is likely to arise on remand, and we therefore have addressed this issue as well. We decline to reach all other issues.

Centerplan Construction Co., LLC *v.* Hartford

reverse the judgment and remand the case for a new trial.

I

The record reveals the following facts and procedural history. The city contracted with DoNo to serve as the developer for the stadium. We refer to their contract as the Developer Agreement. (It is also referred to in the record as the Development Services Agreement). DoNo, in turn, contracted with design-builder Centerplan. We refer to their contract as the Builder Agreement. (It is also referred to in the record as the Design-Build Agreement). Finally, all three parties—the city, Centerplan, and DoNo—also entered into a Direct Agreement.

In December, 2015, a dispute arose between the plaintiffs and the city. Specifically, Centerplan and DoNo claimed that they never were given control over the architect or its design of the stadium as called for by the Developer Agreement, that the scope of the project had increased because of changes the city and the baseball team had made to the stadium's design, and, as a result, DoNo was entitled to additional time and money to complete the stadium. Centerplan therefore sent a notice of claim to DoNo, and, in turn, DoNo sent a notice of claim to the city, requesting a budget increase.[2]

To resolve DoNo's claim, DoNo and the city executed a term sheet on January 19, 2016. The term sheet, among other things, extended the substantial completion deadline for the ballpark from March 11, 2016, to May 17, 2016, prevented any changes to the stadium's design without the city's consent, and modified the liquidated

[2] The city asserts that the notice of claim was sent on behalf of both Centerplan and DoNo, and that the city, Centerplan, DoNo, and the baseball team negotiated new terms to complete the stadium. The plaintiffs contend that DoNo alone sent a notice of claim to the city and that the term sheet resolved the issues raised in that notice of claim between only the city and DoNo. This issue is addressed more fully in part III B and D of this opinion.

Centerplan Construction Co., LLC *v.* Hartford

damages provision in the Developer Agreement. There was no signature line in the term sheet for Centerplan, and, in fact, Centerplan did not sign it. The record does not divulge any reason why Centerplan did not sign the term sheet or was not asked to do so, and counsel for the city, when asked at argument before this court, professed not to know why. The parties also agreed to a change order, dated January 28, 2016, increasing the contract price from $56 million to approximately $63.5 million.

It is undisputed that the extended substantial completion deadline was not attained. On June 6, 2016, the city terminated the Developer Agreement with DoNo and the Builder Agreement with Centerplan. In its termination letter, the city explained that "[t]his termination is based on the continued defaults of [DoNo] and [Centerplan] regarding the design and construction of the Minor League Ballpark . . . . The defaults include, but are not limited to: (1) the failure to pay liquidated damages that have been accruing since the failure to reach substantial completion by May 17, 2016; and (2) the failure to construct the [ballpark] in a workmanlike manner . . . ."[3]

Following the city's termination of Centerplan's and DoNo's contracts, the plaintiffs brought an action seeking an injunction against the termination. The plaintiffs later amended their complaint to include a claim for breach of contract, including allegations that the city had failed to provide notice of and an opportunity to

[3] Although the termination letter does not expressly list "failure to meet the substantial completion deadline" as a reason for terminating Centerplan, the city argued before the trial court that the termination letter encompassed this reason because it stated that the defaults "include, but are not limited to," the listed reasons. In addition, the city contended, its pursuit of liquidated damages as a result of the plaintiffs' failure to meet the substantial completion deadline made plain that the failure itself constituted a reason for termination. On appeal, the plaintiffs do not argue that the termination letter did not specifically include this ground as a reason for termination.

Centerplan Construction Co., LLC *v.* Hartford

cure the alleged defaults before termination, and a claim for breach of the implied covenant of good faith and fair dealing. The amended complaint eliminated any claim for injunctive relief. The city asserted a counterclaim in eighteen counts but withdrew all but two of its counts before the end of trial. Along with the plaintiffs' claims, the remaining two counts of the counterclaim— breach of contract against Centerplan and breach of the implied covenant of good faith and fair dealing against Centerplan and DoNo—were tried to a jury.

In its instructions, the trial court tasked the jury with deciding one question: "Which side is to blame for the stadium not being ready by its May 17, 2016 deadline?"[4] The jury found in favor of the city and against the plaintiffs on the plaintiffs' affirmative claims and in favor of the city on its counterclaim against the plaintiffs, awarding liquidated damages of $335,000.

The plaintiffs jointly appealed to the Appellate Court and moved to transfer the appeal to this court pursuant to Practice Book §§ 65-2 and 66-2. We granted that motion over the city's objection. We will provide additional facts and procedural history as necessary.

II

Centerplan and DoNo claim that the trial court erroneously construed the parties' contracts to place responsibility for the architect and design errors on them across all relevant time periods, including both before and after the term sheet's execution. The city responds that the plain and unambiguous language of the parties' contracts placed this responsibility on the plaintiffs,

---

[4] In the transcript of the trial court's jury instructions, the question appears as, "[w]hich side is to blame for the stadium not being ready by its March [17] 2016 deadline?" In the court's written instructions and on its verdict form, however, the deadline appears correctly as May 17, 2016, the extended substantial completion date reflected in the term sheet. Neither party has raised a claim of error as to this aspect of the jury instructions.

Centerplan Construction Co., LLC *v.* Hartford

precisely as the trial court ruled it did. The city further argues that it is irrelevant whether the contracts made the plaintiffs legally responsible for the architect and the design before the execution of the term sheet because the term sheet fully waived any preterm sheet claims regarding architect control, design errors, and increased construction costs.

We disagree with the city that the term sheet waived the plaintiffs' claims and, accordingly, must address the plaintiffs' claim regarding legal control of the architect and stadium design. Our review of the parties' contracts leads us to conclude that they did not unambiguously grant the plaintiffs legal control of the architect and the stadium's design across all relevant time periods. First, we hold that, under the contracts, the city plainly and unambiguously maintained legal control of the architect and stadium design as a matter of law from the signing of the original agreements in February, 2015, to the assignment of the agreement between the city and Pendulum Studios II, LLC, (Architect Agreement) in May, 2015, and that the city retained responsibility for the architect's errors during this time period. Second, we hold that, from the assignment of the Architect Agreement in May, 2015, to January, 2016, when the term sheet was executed, the plaintiffs plainly and unambiguously had legal control of the architect and stadium design as a matter of law. Last, we hold that, from the term sheet's execution in January, 2016, until the city terminated its contractual relationship with Centerplan and DoNo in June, 2016, the question of which party had legal control of the architect and stadium design is ambiguous. Because the trial court's pretrial ruling improperly took from the fact finder several questions of fact, including the issue of the parties' intent regarding architect control during this third period of time—after the term sheet's execution and

Centerplan Construction Co., LLC *v.* Hartford

until the city terminated the plaintiffs' contracts—we must remand the case for a new trial.[5]

A

The record reveals the following additional facts and procedural history relevant to these issues. Count one of the plaintiffs' complaint alleges that the city materially breached its contractual obligations under the Developer Agreement by not relinquishing control of the architect and the stadium's design. The plaintiffs allege that this material breach prevented Centerplan from controlling the design and staying within the project's budget. The plaintiffs also allege that the city continued to issue changes to the design after the execution of the term sheet, that Centerplan lacked the ability to reject the changes, and that these additional changes made it impossible to finish construction by the substantial completion deadline. As a result, the plaintiffs allege, the city wrongfully terminated their contracts despite the city's own material default for issuing design changes that increased costs and prevented Centerplan from finishing on time.

Only weeks before trial, at the trial court's behest, the parties filed a number of motions to narrow the scope of the upcoming trial. Among the motions the city filed was a motion in limine asking the trial court to rule, as a matter of law, that the plaintiffs had waived any claims against the city predating or arising out of the subject matter of the term sheet. The city argued that the term sheet had released any claims against the

_____

[5] We note that the plaintiffs may still proceed with the theory they advanced at the first trial, which was that, even if they had legal control of the architect and the stadium's design, the city interfered with that control. Our conclusions of law are limited to the interpretation of the parties' contracts. The question of whether the city in fact interfered with the plaintiffs' legal control of the architect and the stadium's design, thereby delaying construction and breaching its contractual duties to the plaintiffs, is more appropriately addressed by the fact finder on remand.

Centerplan Construction Co., LLC *v.* Hartford

city as of the term sheet's execution, including claims regarding "control over and scope of the [s]tadium design, purported design errors and omissions, the cost of construction, and the substantial completion deadline." The city sought to limit the issues at trial to whether it had made material changes to the stadium design after the execution of the term sheet such that Centerplan could not meet the substantial completion deadline. The plaintiffs responded that, because the city was exercising its reserved rights under the term sheet to contest the preterm sheet claims and a preterm sheet change order, dated December 24, 2015, notwithstanding the release language contained in the term sheet, Centerplan and DoNo should also be able to pursue their claims.

When the parties appeared before the trial court to argue the motion in limine, among other motions, the trial court signaled its interpretation of the release provisions: that, if the city did not dispute the preterm sheet claims and preterm change order, then those topics were no longer "fair game" for trial. In response, the city withdrew its counterclaims against Centerplan and DoNo contesting the preterm sheet claims and the preterm sheet change order. The plaintiffs then argued that, notwithstanding the city's withdrawal of those counterclaims, they were still entitled to present evidence of architect and design control to establish that the city was in fact in charge of the architect before the execution of the term sheet and that, during that time, the architect committed errors that led to Centerplan's inability to meet the substantial completion deadline even after the term sheet's execution. The city filed a renewed motion in limine to preclude that evidence. The trial court granted the motion, in part, on the record, noting that the plaintiffs could still present evidence of design problems as background for their

postterm sheet design claims but not as a basis for liability or damages.

At the same time, the trial court issued a ruling as to legal control of the architect and design under the parties' agreements. The court determined that the plain language of the contracts granted the city "the right to approve the architectural plans and changes to them" but granted Centerplan and DoNo "the right to control how the plans were carried out, including control over the architect." This authority, the trial court reasoned, derived from the Developer Agreement, the Builder Agreement, and the Architect Agreement. The trial court emphasized provisions in the Developer Agreement that, in its view, promised DoNo operational control over architectural issues, assigned DoNo the job of completing the in progress project plans, and provided that DoNo would assume the city's rights and obligations under the Architect Agreement. The trial court noted that the Developer Agreement allowed the baseball team to visit the stadium and granted the team the right to request certain modifications to the design, so long as the team did not "hinder or interfere with the construction of the Project Facilities or the activities of [DoNo's] contractors . . . ." (Internal quotation marks omitted.) The trial court also emphasized that the Developer Agreement granted the city " 'commercially reasonable approval' " over the project plans, but, otherwise, it was the parties' intention that DoNo would have complete control over the stadium design and construction, and that DoNo would be responsible for the architect's acts and omissions. The trial court highlighted that the Builder Agreement placed the same emphasis on the plaintiffs' bearing responsibility for design issues as did the Developer Agreement.

Regarding the assignment, the trial court observed that, "to carry out its earlier promise to let DoNo assume [the city's] rights over the architect, [the city] signed

a document assigning its right under the architect's contract with the city.'' The trial court then determined that the only obligations the city retained after the assignment was the obligation to pay the architect for part A and part B services detailed in the Architect Agreement, which included concept design, programming confirmation, schematic design, foundation and seating permits, design development, and construction documentation. Centerplan was responsible for paying for everything else referred to in the assignment, including part C work, also detailed in the Architect Agreement, which included construction administration and '' 'the applicable representations . . . terms, and conditions' of part A, part B, and every other contractual matter related to the architect.'' The trial court concluded that, as a whole, the ''agreements plainly assign to Centerplan and DoNo the dominant power over design issues that arise while carrying out the plans. This power includes the right to direct architect activities during the design and construction process, and explicit responsibility for the architects' acts and omissions. [The city] must agree to the plans and changes to them. DoNo and Centerplan are in charge of carrying them out.'' Therefore, the trial court explained, if construction slowed because of design issues, ''the contracts make Centerplan and DoNo responsible.'' The trial court specifically reserved for the jury's determination the issue of whether the city ''violated [the plaintiffs' rights regarding the architect and design] by frustrating the development team's work [and thereby] causing [it] to miss the deadline; then, it would be fair for the jury [to] find for Centerplan and DoNo.''

Pursuant to the trial court's rulings, the plaintiffs were therefore able to present evidence at trial only as to the city's interference with the plaintiffs' legal control over the architect and the stadium's design after the term sheet's execution. The plaintiffs consistently main-

Centerplan Construction Co., LLC *v.* Hartford

tained throughout trial that the city controlled the architect prior to the execution of the term sheet, and the plaintiffs attempted to present evidence to that effect, as well as evidence that the architect made design errors during that time period that prevented the plaintiffs from meeting the substantial completion deadline. Those attempts prompted objections from the city, in response to which the trial court issued curative instructions to the jury that the testimony was only background to the key period after the execution of the term sheet, and that, ultimately, the plaintiffs were always responsible for the architect and the design.

At the end of trial, the trial court charged the jury that "[t]he parties also agreed that Centerplan and DoNo would be responsible for the architects and any mistakes they may have made; so, if the architects did something wrong, you have to start with the assumption that Centerplan and DoNo are to blame for it."[6] Because of the trial court's rulings on the various motions in limine, the only issue left for the jury to decide was, as the court stated: "Which side is to blame for the stadium not being ready by its May 17, 2016 deadline?"

B

Before addressing the issue of which party controlled the architect under the parties' agreements as a matter of law, both before and after the execution of the term sheet, we must determine whether, by executing the term sheet, the plaintiffs waived any contractual right to litigate claims predating the term sheet. If we conclude that the plaintiffs waived such rights, we must then limit our review to a determination of which party

[6] Contrary to its prior ruling, the trial court did not instruct the jury that, if the city "violated [the plaintiffs' rights regarding the architect and design] by frustrating the development team's work [and thereby] causing [it] to miss the deadline, then it would be fair for the jury [to] find for Centerplan and DoNo." On appeal, the plaintiffs make no claim of error in this regard.

Centerplan Construction Co., LLC *v.* Hartford

controlled the architect after the term sheet's execution and pursuant to its language. We conclude that the term sheet did not fully waive the plaintiffs' claims.

On appeal, the plaintiffs claim that the trial court erroneously placed responsibility for the architect and design errors on Centerplan and DoNo across all relevant time periods. Specifically, they argue that both prior to and after the May, 2015 assignment, the city and the baseball team secretly met with the architect and ordered changes to the design. According to the plaintiffs, these changes delayed the substantial completion date and substantially increased construction costs. Therefore, in December, 2015, DoNo sent a notice of claim to the city, pursuant to the Developer Agreement, seeking additional time and money to complete the stadium. The city responds that, under the plain language of the term sheet, which the parties intended to resolve DoNo's claim against the city, the plaintiffs waived any right to contest any errors by the city that occurred before the term sheet's execution, including any architect errors over which the city previously had control.[7]

At the pretrial hearing to resolve the city's motion to preclude evidence and testimony of preterm sheet claims, the trial court ruled that the reserved rights provisions of the term sheet meant that, if the city did not dispute the preterm sheet claims and preterm sheet change order, then Centerplan and DoNo did not have the right to press those same claims. In the court's view, the city's

_____

[7] The plaintiffs also argue that the city continued to issue changes to the design plans for the stadium after the execution of the term sheet, thereby disrupting the plaintiffs' ability to finish on time. The city responds that the term sheet plainly and unambiguously vested control over the architect with the plaintiffs, and, thus, the trial court properly determined, as a matter of law, that any architect and design errors after the execution of the term sheet must be attributable to the plaintiffs. We address this argument in part II C 3 of this opinion.

Centerplan Construction Co., LLC *v.* Hartford

challenge to the plaintiffs' claims was a condition prece-
dent to the plaintiffs' ability to prosecute their preterm
sheet claims, and, therefore, it precluded the plaintiffs
from presenting evidence of architect and design errors
that arose prior to the term sheet that the plaintiffs
contend led to their failure to meet the substantial com-
pletion deadline. The trial court did not treat Centerplan
and DoNo as separate entities or discuss the differences
in the language of the reserved rights provisions relating
to these two entities. To assess the plaintiffs' claim that
the trial court erroneously ruled that they waived their
rights to prosecute their preterm sheet claims, we dis-
cuss in turn each applicable provision of the term sheet.

Given the trial court's sole reliance on the term sheet's
language and the parties' disagreement about the mean-
ing of that language, "the first question that this court
must address is not whether the trial court's substantive
interpretation of the [term sheet] was correct, but the
more fundamental question of whether the relevant lan-
guage was plain and unambiguous. . . . [T]hat deter-
mination is a question of law subject to plenary review."
*Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 101, 84
A.3d 828 (2014). "A contract is unambiguous when its
language is clear and conveys a definite and precise
intent." (Internal quotation marks omitted.) Id., 102–103.
By contrast, a contract is ambiguous if its language is
susceptible to more than one reasonable interpretation.
Id., 103. The trial court held that the language of the
term sheet was plain and unambiguous.

Paragraph 15 of the term sheet provides: "[DoNo] and
the [city] each waive any and all claims that each may
have against the other, or that might arise from, the
matters that are subject of this agreement (*subject only
to the reserved rights in* [*paragraphs*] *2 and 4 . . .*
)." (Emphasis added.) Given the term sheet's qualifica-
tion of the release provision, the plain language of para-
graph 15 manifests a more limited waiver of the parties'

Centerplan Construction Co., LLC *v.* Hartford

rights to sue than the city contends. The reserved rights in paragraphs 2 and 4 provide the parties the ability to contest certain claims despite the release provision. Thus, we must determine whether the claim that the trial court precluded the plaintiffs from raising at trial fell within the limited scope of paragraphs 2 and 4.

Paragraph 4 provides that, if the interim milestones to complete the stadium established in paragraph 3 of the term sheet[8] are not met, and Centerplan does not provide a recovery plan and updated schedule, the city shall "[h]ave the right to contest the Claim dated December 17, 2015 and the resulting Change order . . . . *If this option is pursued*, [DoNo] and [Centerplan] shall likewise have the right to assert and prosecute such Claim and to assert any and all defenses in response to any claim by the city." (Emphasis added.)

The phrase, "[i]f this option is pursued," supports the trial court's interpretation that the city must first contest the claims before Centerplan has the ability to assert and prosecute its claims and defenses. Use of the qualifier "if" in a contract often creates a condition precedent. See, e.g., *EH Investment Co.*, *LLC* v. *Chappo*, *LLC*, 174 Conn. App. 344, 361, 166 A.3d 800 (2017); id. ("parties often signal their agreement to create an express condition precedent by using words such as . . . 'if' "). "A condition precedent is a fact or event [that] the parties intend must exist or take place before there is a right to performance. . . . A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. . . . If the condition is not fulfilled, the right to enforce the contract does not come into exis-

---

[8] The interim milestones included the completion of (1) structural steel erection and exterior wall enclosures by March 9, 2016, (2) watertight roofing areas by April 7, 2016, (3) brick veneer by April 15, 2016, and (4) front counters, ventilation hoods, overhead cooling door, refrigerant piping, remote refrigeration, walk-in coolers, and equipment by April 21, 2016.

tence. . . . Whether a provision in a contract is a condition the [nonfulfillment] of which excuses performance depends [on] the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances when they executed the contract.'' (Internal quotation marks omitted.) *Wells Fargo Bank, N.A.* v. *Lorson*, 341 Conn. 430, 440, 267 A.3d 1 (2021). ''[T]his option'' plainly refers to the city's ''option'' to contest the preterm sheet claims if the interim milestones were not achieved. The phrase appears after the articulation of the city's right to contest the December, 2015 claims and preterm sheet change order, and prior to the articulation of Centerplan and DoNo's parallel rights.

The circumstances surrounding the term sheet's execution lead us to conclude that the word ''[i]f'' in paragraph 4 of the term sheet was in fact intended to create a condition precedent. The parties wanted to finish the stadium by May 17, 2016, and the city wanted to ''neutralize [the] plaintiffs' threat to stop construction.'' Allowing the plaintiffs to prosecute their preterm sheet claims earlier would have worked against meeting the substantial completion deadline, thereby jeopardizing the ability of the baseball team to fully use the stadium by the beginning of the baseball season. It also would have undermined the purpose of the term sheet as a settlement agreement if the plaintiffs had the ability to reassert their preterm sheet claims every few weeks. Thus, we conclude that the trial court correctly determined that paragraph 15 of the term sheet clearly and unambiguously waives Centerplan's right to pursue its preterm sheet claims at trial because the city withdrew its counterclaims against the plaintiffs' contesting the preterm sheet claims and the preterm sheet change order, and, therefore, the condition precedent in paragraph 4 did not arise.[9]

[9] Our analysis as it relates to Centerplan does not end there, however, because, as discussed in part III of this opinion, it is unclear whether Cen-

Centerplan Construction Co., LLC *v.* Hartford

Further, paragraph 2 of the term sheet modifies the parties' agreement regarding liquidated damages, found in the Developer Agreement. Paragraph 2 provides in relevant part: "If the Substantial Completion Date is not attained," the city "shall have the right to contest the Claim dated December 17, 2015, and the resulting Change Order . . . and [DoNo] shall likewise have the right to assert and prosecute such Claim and to assert any and all defenses in response to any claim by the city." We concede that, at first glance, the phrase, "and [DoNo] shall likewise have the right," contained in paragraph 2, might evince an intent to base DoNo's right to contest the claims on the city's having first contested the claims if the substantial completion deadline were not attained. We must read this provision, however, in the context of the entire agreement. See, e.g., *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 671, 791 A.2d 546 (2002) ("[t]he contract must be viewed in its entirety, with each provision read in light of the other provisions"). When we read the entire term sheet in context, this interpretation of paragraph 2 is belied by the parties' use of more restrictive language in a later provision. Specifically, as discussed, under paragraph 4 (c), unlike paragraph 2, if the interim milestones to complete the stadium, as established in the term sheet, were not met, the parties explicitly conditioned Centerplan's and DoNo's rights to prosecute their claims on the city's having first contested the claims

_____

terplan ratified the term sheet. If, on remand, the fact finder determines that Centerplan ratified the term sheet, then the dispositive issue will, at least as to Centerplan, be limited to which party had control over the architect, as a matter of law, after the term sheet's execution. In the event the fact finder determines that Centerplan did not ratify the term sheet and, thus, did not waive its contractual right to prosecute its preterm sheet claims, we have provided additional analysis, to the extent it applies on remand, regarding whether the relevant contracts make clear and unambiguous which party had control over the architect across all relevant time periods. See part III B and D of this opinion.

Centerplan Construction Co., LLC *v.* Hartford

and preterm sheet change order. The use of restrictive language in paragraph 4 shows that the parties knew how to condition the plaintiffs' right to prosecute certain claims on the city's first having contested the claims. See *Zhang* v. *Omnipoint Communications Enterprises, Inc.*, 272 Conn. 627, 639, 866 A.2d 588 (2005) ("[a]lthough we recognize that the introductory paragraph of the deed references only an easement for the transmission of electric current, that fact does not overcome strong evidence of a contrary intent in the more specific provision setting forth the permissible uses of the easement"). The fact that the parties did not use similar conditional language in paragraph 2 compels the conclusion that, because the substantial completion deadline was not attained, DoNo has the right to prosecute its claims, irrespective of whether the city contests the claims or the change order, and, therefore the trial court's ruling was erroneous as it applied to DoNo. As a result of the trial court's incorrect ruling as to DoNo regarding waiver, we conclude that the trial court erroneously prevented DoNo from fully pursuing the claims against the city that it was entitled to pursue under the term sheet.

C

Nevertheless, the trial court's improper ruling regarding waiver is pertinent only if the parties' contracts do not plainly and unambiguously grant the plaintiffs control over the architect across all relevant time periods. We thus address the claim that the trial court incorrectly concluded, as a matter of law, that the plaintiffs controlled the architect and were therefore responsible for any mistakes in and changes to the stadium's design.

We interpret the parties' legal rights and responsibilities regarding the architect under the collective agreements, both before and after the execution of the term

Centerplan Construction Co., LLC *v.* Hartford

sheet.[10] "[W]hen there are multiple writings regarding the same transaction, the writings should be considered together in construing the contract." (Internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, supra, 259 Conn. 671, quoting *Mongillo* v. *Commissioner of Transportation*, 214 Conn. 225, 229, 571 A.2d 112 (1990). Interpretation of an unambiguous contract is subject to plenary review, as is "the determination [of] whether [the] contractual language is plain and unambiguous . . . ." *Cruz* v. *Visual Perceptions, LLC*, supra, 311 Conn. 101–102. "When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact . . . ." (Internal quotation marks omitted.) Id.

1

Legal Control of Architect from
February to May, 2015

We begin with the parties' original agreements—the Architect Agreement, the Developer Agreement, and the Builder Agreement—which governed the project from February to May, 2015.

On August 29, 2014, the city and Pendulum Studios II, LLC, entered into the Architect Agreement, which initially governed the architect's responsibilities regarding the stadium's design. After the architect began designing the stadium, the city entered into the Developer Agreement with the plaintiffs to administer and complete the architect's in progress plans, and Centerplan and DoNo entered into the Builder Agreement to do the same. The plaintiffs claim that the terms of the Developer Agreement required the city to assign the Architect Agreement to them before or during the

---

[10] If the fact finder determines as a matter of law that Centerplan ratified the term sheet, and therefore waived the ability to prosecute the preterm sheet claims, then the only issue as to Centerplan is legal control of the architect and design of the stadium after execution of the term sheet.

Centerplan Construction Co., LLC *v.* Hartford

stadium design phase but that the city never actually did so during that time period; in fact, the architect had already completed the stadium's design by the time the parties effectuated the assignment. In further support of this claim, the plaintiffs argue that the Builder Agreement defined "architect" as the person "having a direct contract with the Design-Builder to perform design services," but Centerplan never had a direct contract with the architect for design services during the entire project.

The city responds that the unambiguous language of the parties' agreements allocated to the plaintiffs both responsibility for and control of the architect and the stadium's design. The city argues that no provision in the parties' original agreements conditioned the exercise of the plaintiffs' rights over the architect and the stadium's design on the city's having first formally assigned the Architect Agreement to the plaintiffs because the Builder Agreement and the Developer Agreement explicitly provided the plaintiffs with the ability to control the architect. Centerplan did not need a direct contract with the architect, the city contends, to bear legal responsibility for the architect's acts and omissions because the Builder Agreement made Centerplan responsible for design professionals generally. In any event, because time was of the essence to complete the stadium by March 11, 2016, the city argues that it is unreasonable to infer that the plaintiffs' control of the architect was silently conditioned on a future assignment. We agree with the plaintiffs that the contracts contemplated a subsequent assignment of the Architect Agreement.

The plain language of the Developer Agreement and the Builder Agreement clearly manifests the parties' intent that Centerplan and DoNo would control the architect and the stadium's design. No party disputes this, nor can they. For example, the Developer Agreement between the city and DoNo mandates that DoNo

Centerplan Construction Co., LLC *v.* Hartford

shall "retain . . . Pendulum Studio II, LLC, as Project Architect," "supervise, manage and administer the completion of the In Progress Project Plans," and "have sole control over the design of the Project Facilities and finalization of the In Progress Project Plans (subject only to [the] city's right to review and approve any Material Changes in its sole discretion . . .)." The Developer Agreement also states that DoNo "shall assume [the] city's rights and obligations under the [Architect Agreement] by and between [the] city and [the architect]," and that it is the parties' intention that DoNo "have complete control over the design and construction means and methods to be performed at the Project Facilities, subject to the approval rights of [the] city . . . ." Likewise, the Builder Agreement provides that, "[s]ubject to the [city's] rights with respect to direction or approvals of design," Centerplan "shall have sole control and discretion over the design of the Project," including "all aspects of management and administration of the design and construction of the Project . . . ." The Builder Agreement further provides that Centerplan shall be responsible for the "acts and omissions of the . . . Architect, Contractors, Subcontractors and their agents and employees, and other persons or entities, including the Architect and other design professionals, performing any portion of [Centerplan's] obligations under the Design-Build Documents."[11]

---

[11] The city additionally points to language in the Developer Agreement that provides that DoNo "shall have control of . . . management of all other third party vendors . . . including, without limitation, architects," and sole responsibility and control of the stadium's design. The city also cites language in the Builder Agreement that provides that Centerplan is not required to "take direction from or accept any changes to the design or construction of the Project from the [city]." We agree with the city that this language supports its position that the parties intended that the plaintiffs would control the architect and the stadium's design, but, as we explain, the contracts do not indicate whether they automatically assigned control to the plaintiffs.

Centerplan Construction Co., LLC *v.* Hartford

The original agreements, however, are silent as to whether the parties intended for the agreements automatically and implicitly to assign legal control of the architect to Centerplan and DoNo, or whether this control was conditioned on the parties' first entering into a separate assignment. The mere existence of the May, 2015 assignment clarifies the parties' intent. "[I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." (Internal quotation marks omitted.) *Honulik* v. *Greenwich*, 293 Conn. 698, 711, 980 A.2d 880 (2009). This wisdom also applies when giving effect to provisions in subsequent contracts. See *Tomey Realty Co.* v. *Bozzuto's, Inc.*, 168 Conn. App. 637, 653, 654–55, 147 A.3d 166 (2016) (reversing grant of summary judgment when trial court failed to give effect to operative provisions in lease, amendment to that lease, and assignment of that lease). The later assignment of the Architect Agreement would have been superfluous if Centerplan and DoNo already had legal control of the architect from the outset. As we will explain in more detail, the assignment was not a formality or technicality but a full assignment that affected the parties' contractual rights related to the control of and payment for the architect. It would therefore be incongruous to read the parties' earlier contracts as automatically granting Centerplan and DoNo legal rights over the architect and design.

The assignment's recitals also comport with the understanding that the parties intended that there would be a future assignment. Specifically, the assignment states that the Developer Agreement "contemplated that DoNo would design, develop and construct the Stadium and that [the city] *would assign* the [Architect] Agreement . . . to DoNo . . . ." (Emphasis added.) Although, as "a general rule, [r]ecitals in a con-

Centerplan Construction Co., LLC *v.* Hartford

tract, such as whereas clauses, are merely explanations of the circumstances surrounding the execution of the contract, and are not binding obligations unless referred to in the operative provisions of the contract''; (internal quotation marks omitted) *Tomey Realty Co.* v. *Bozzuto's, Inc.*, supra, 168 Conn. App. 653 n.10; recital language is context that confirms that the parties intended that there would be a subsequent assignment of the Architect Agreement. In fact, that assignment occurred in May, 2015, three months after the city entered into the contracts with the plaintiffs.

We therefore conclude that the parties plainly and unambiguously provided that, until the city assigned the Architect Agreement to Centerplan and DoNo, the city maintained legal control of and responsibility for the architect, including any errors or omissions that occurred before May, 2015.

2

Legal Control of Architect from
May, 2015, to January, 2016

Next, we discuss the city's May, 2015 assignment of the Architect Agreement to the plaintiffs, which affects who had control of the architect from May, 2015, to January, 2016.

The plaintiffs argue that this assignment is only a partial assignment, as the recitals note that the design was complete by May, 2015, leaving only part C services, related to construction administration, for the plaintiffs to direct. The city, on the other hand, argues that it is "an assignment of the entire Architect Agreement" rather than a partial assignment. The city further argues that the assignment's plain language transferred to Centerplan the city's obligation to pay the architect and relieved the city of future payments. The trial court agreed with the city, concluding that the city's only

"obligations" were those that "derive[d]" from parts A
and B of the Architect Agreement, and that "this lan-
guage means that [the city kept] the obligation to pay
the architect under part[s] A and B and Centerplan
pick[ed] up everything else the assignment refers to
. . . ."

We hold that the assignment's clear language plainly
and unambiguously provides that the plaintiffs had legal
control of the architect and design as a matter of law,
upon the assignment's execution, including responsibil-
ity for any design errors committed after the assign-
ment's execution, consistent with the trial court's
ruling. Where we depart from the trial court's ruling
is its determination, as a matter of law, that, by the
assignment, the city plainly and unambiguously retained
only the "obligation" to pay the architect for part A and
part B services already rendered but not responsibility
for any preexisting architect or design errors. We con-
clude that the assignment's plain and unambiguous lan-
guage establishes that the city retained all obligations
regarding the architect arising out of the architect's
services before the assignment, including responsibility
for any of the architect's errors and omissions. See part
II C 1 of this opinion.

"[T]o constitute an assignment there must be a pur-
pose to assign or transfer the whole or a part of some
particular thing . . . and the subject matter of the
assignment must be described with such particularity
as to render it capable of identification." (Internal quo-
tation marks omitted.) *Dysart Corp.* v. *Seaboard Surety
Co.*, 240 Conn. 10, 17, 688 A.2d 306 (1997). "Unless the
language or the circumstances indicate the contrary
. . . an assignment of the contract or of all [the assign-
or's] rights under the contract . . . is an assignment
of the assignor's rights and a delegation of his unper-
formed duties under the contract." (Internal quotation
marks omitted.) *Brett Stone Painting & Maintenance*,

Centerplan Construction Co., LLC *v.* Hartford

*LLC* v. *New England Bank*, 143 Conn. App. 671, 689, 72 A.3d 1121 (2013), quoting 3 Restatement (Second), Contracts § 328, pp. 44–45 (1981).

Facially, the May, 2015 assignment does not purport to be only a partial assignment. The full Architect Agreement was appended to the assignment, and the recital to the assignment states that the city is assigning "*all* of [the city's] right, title, and interest" in the Architect Agreement to Centerplan. (Emphasis added.) Paragraph 7 of the assignment provides in relevant part that "[Centerplan], by its acceptance of this [a]ssignment, hereby assumes and agrees to be bound by the applicable representations, obligations, terms, and conditions of the [Architect] Agreement . . . ." Paragraph 5 of the assignment provides in relevant part that, upon delivery of the assignment, the architect "shall commence work on Part C . . . of the [Architect] Agreement and shall complete the same under the purview and direction of [Centerplan]."

"The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." (Internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, supra, 259 Conn. 670. Under the clear and unambiguous language of the assignment, the plaintiffs were legally responsible for the architect's errors and omissions committed after the assignment, even if the design was "complete" and the architect was providing only construction administration services at the time. The plaintiffs' contention that they did not assume responsibility for design errors after the assignment because the architect had completed the design and transitioned to only construction administration cannot be reconciled with the plain language of the assignment and the arguments the plaintiffs made at trial and on appeal to this court. The architect may have completed certain parts of its design responsibilities, but that does not alter the assignment language,

Centerplan Construction Co., LLC *v.* Hartford

which transferred all "representations, obligations, terms, and conditions of" the Architect Agreement—and with it, control of and liability for the architect—wholly to Centerplan. The plaintiffs claimed throughout the litigation that there were architect and design errors throughout the construction of the stadium, including after the assignment and the term sheet. Additionally, on appeal, the plaintiffs argue that the change directives issued by the architect *after* the assignment were changes to the stadium design that delayed construction. It can hardly be said now that the language providing that the architect will commence construction administration services "under the purview and direction of [Centerplan]" somehow limits the plaintiffs' responsibility for design errors from the date of the assignment or to review of past architectural work. We therefore conclude that it is plain and unambiguous that the May, 2015 agreement constitutes a full assignment of the Architect Agreement, with all the attendant rights, responsibilities, and liabilities regarding the architect and stadium design, from the city to the plaintiffs.

We also conclude that the plain and unambiguous language of the assignment establishes that the city retained responsibility for the architect's errors and omissions prior to the assignment. Paragraph 7 of the assignment provides in relevant part that "[Centerplan], by its acceptance of this Assignment, hereby assumes and agrees to be bound by the applicable representations, obligations, terms, and conditions of the [Architect] Agreement . . . ." The assignment continues, providing that the city "shall be relieved of further obligation pursuant to the same should such obligation arise on or after execution of this Assignment and pertain to any matter that does not derive from Part A or Part B of Exhibit B of the [Architect] Agreement."

The assignment does not define the term "obligation." "We often consult dictionaries in interpreting contracts

. . . to determine whether the ordinary meanings of the words used therein are plain and unambiguous, or conversely, have varying definitions in common parlance.'' (Internal quotation marks omitted.) *Nation-Bailey* v. *Bailey*, 316 Conn. 182, 193, 112 A.3d 144 (2015). Black's Law Dictionary defines ''obligation'' as a ''legal or moral duty to do or not [to] do something,'' a ''formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp[ecially], a duty arising by contract,'' and a ''legal relationship in which one person, the obligor, is bound to render a performance in favor of another, the obligee.'' Black's Law Dictionary (11th Ed. 2019) p. 1292. The definition of ''obligation,'' therefore, includes not only the duty to pay but also any broader legal duties the city may owe to the architect under the contract.

When ''obligation'' is read in the context of the entire provision, as well as the rest of the assignment, it is clear that the parties intended the term to be construed broadly. See, e.g., *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, supra, 259 Conn. 671. The sentence in question states that the city ''shall be relieved of further obligation . . . should such obligation arise on or after execution of this Assignment and pertain to *any matter that does not derive from Part A or Part B* . . . .'' (Emphasis added.) The use of the phrase ''any matter that does not derive from Part A or Part B'' to describe the obligations that the city is relieved from undertaking indicates responsibility beyond just paying the architect. This provision states that the city is relieved from further obligations related to ''any matter'' that *does not* derive from part A or B work. The necessary inference is that the city also retains obligations related to ''any matter'' that *does* derive from part A or B work. We have previously explained that, in the absence of a clear limitation in the text of a contract,

the word "any" gives the resulting phrase an expansive meaning. See, e.g., *Salce* v. *Wolczek*, 314 Conn. 675, 686, 104 A.3d 694 (2014). The provision is not limited to payment. Two other provisions in the assignment state that the city "will remain responsible to [the architect]" to pay for additional part B services. Another provision states that Centerplan will pay the architect for part B services, notwithstanding the additional services for which the city agreed to reimburse. The use of more specific language pertaining to payments, including invoice numbers and dollar amounts, in other provisions and not when discussing the city's future obligations supports the conclusion that the terms "obligations" and "any matter" in paragraph 7 of the assignment do not contain a limitation as to paying the architect. See *Zhang* v. *Omnipoint Communications Enterprises, Inc.*, supra, 272 Conn. 639; see also *Miller Bros. Construction Co.* v. *Maryland Casualty Co.*, 113 Conn. 504, 514, 155 A. 709 (1931) ("we must bear in mind that the particular language of a contract must prevail over the general"). In the absence of limiting language, the plain meaning of the sentence, therefore, is that the city has an "obligation" of liability for design errors that arise out of "any matter" related to the architect's part A and part B services. This is consistent with the city's control of the architect before the assignment, given that the majority of the architect's design responsibilities were completed during that time.

This broader interpretation of the word "obligation" is also informed by our case law regarding assignments. "[U]nless there has been an express assumption of liability, the assignee is not liable to the debtor for liabilities incurred by the assignor in connection with the subject matter of the assignment. . . . As such, [i]n the absence of an express contract provision, an assignee generally does not assume the original responsibilities of the assignor . . . ." (Citation omitted; internal quo-

Centerplan Construction Co., LLC *v.* Hartford

tation marks omitted.) *Hartford* v. *McKeever*, 139 Conn. App. 277, 285, 55 A.3d 787 (2012), aff'd, 314 Conn. 255, 101 A.3d 229 (2014). Because no other part of the assignment expressly provides for the transfer of liability, the implication of the city's argument that the assignment pertained only to the obligation of paying the architect is that the plaintiffs did not assume future responsibility for the architect's errors and omissions, and, thus, all liability regarding the architect and the stadium defaults to the city as the assignor. Given that we hold that the plain and unambiguous language of the assignment vests the plaintiffs with legal control of the architect, it would be an absurd result to interpret "obligations" not to include liability for the architect's errors and omissions. See, e.g., *Grogan* v. *Penza*, 194 Conn. App. 72, 79, 220 A.3d 147 (2019).

We therefore hold that, for the period of time between May, 2015, to January, 2016, it is plain and unambiguous as a matter of law that the plaintiffs assumed legal control of the architect and the stadium's design upon assignment of the Architect Agreement, and that the city retained liability for preexisting architect and stadium design errors that occurred before May, 2015.

3

Legal Control of Architect from
January to June, 2016

Finally, we turn to the term sheet itself to determine whether it clearly and unambiguously provides which party had control of the architect from January to June, 2016, as a matter of law.

The plaintiffs claim that the term sheet clearly and unambiguously gave the city exclusive control of the design of the stadium. Specifically, they point to the term sheet's provision that "[t]here will be no new design changes to the Ballpark without the express written

Centerplan Construction Co., LLC *v.* Hartford

consent of the city'' and that such consent ''may be withheld in its sole and absolute discretion . . . .'' The city argues that, on its face, the term sheet does not allow the city to make changes to the design; rather, it only allows the city to withhold its consent to changes sought by others. The city further argues that there was no reason for the plaintiffs to cede design control to the city in light of the new substantial completion deadline.

We cannot say that it is plain and unambiguous as a matter of law which party had legal responsibility for the architect and design under the language of the term sheet. On the one hand, the term sheet language lends support to the interpretation that the plaintiffs maintained full legal control of the architect and design after the assignment. Nothing in the term sheet explicitly provides that the plaintiffs ceded control back to the city or that the city gained or received control. The term sheet provided the plaintiffs with what they wanted when they sent the notice of claim in December, 2015: ''no new design changes . . . .'' The term sheet, therefore, can quite reasonably be read to set a fixed design for the plaintiffs to complete by the substantial completion deadline. The notices of claim filed in December, 2015, complained primarily about the city's delay in assigning the plaintiffs the Architect Agreement such that the plaintiffs would be unable to finish the stadium on time. It would be incongruous, then, for the plaintiffs to transfer control back to the city. Thus, one reasonable interpretation of the term sheet is that it did not affect the legal control of the architect and stadium design that the assignment had delegated to the plaintiffs.

The other reasonable interpretation is that the term sheet ceded legal control of the architect and the design to the city. The Developer Agreement provides that ''[a] change order requested by [the] Developer shall be subject to the approval of [the] city (which may be

Centerplan Construction Co., LLC *v.* Hartford

granted or denied in [the] city's sole discretion) *only if it is for a Material Change to the In Progress Project Plans . . . .*'' (Emphasis added.) The term sheet, however, provides that the city must consent to any "design changes," not just material changes. The use of more general language regarding the city's right to consent (or not to consent) to design changes in the term sheet compared to the Developer Agreement suggests that, after the term sheet, the city gained additional control over the architect and design. See *Zhang* v. *Omnipoint Communications Enterprises, Inc.*, supra, 272 Conn. 639. Given the circumstances leading to the term sheet—including the city's desire to achieve substantial completion by the deadline—it is at least plausible, and perhaps logical, for the city to have desired to exercise greater control over the architect and design. We are not convinced that the power to withhold consent, paired with the requirement that every design change after the term sheet be given consent before commencing, amounts to a *lack* of control over the architect and the design. See *Grovenburg* v. *Rustle Meadow Associates, LLC*, 174 Conn. App. 18, 47–51, 165 A.3d 193 (2017) (recognizing that common interest community association has broad design control powers through granting or withholding consent to construction sought by unit owners in community).

We conclude that both parties' interpretations are reasonable, and, therefore, the issue of architect control after the term sheet is ambiguous. The extent of legal responsibility over the architect and design from January to June, 2016, must be determined by the fact finder.[12]

### III

Because we have concluded that this case must be remanded for a new trial, we would not ordinarily find

[12] We leave it to the trial court on remand to determine whether, with a fuller record, these questions may be resolved through summary judgment.

Centerplan Construction Co., LLC *v.* Hartford

it necessary to address the plaintiffs' further claim that the term sheet does not unambiguously eliminate Centerplan's right to notice and an opportunity to cure under the Builder Agreement.[13] Because this issue is likely to arise at a new trial, however, we conclude that it is appropriate to address it. See Practice Book § 84-11; *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 164, 971 A.2d 676 (2009).

The plaintiffs argue that the term sheet could not have superseded the original notice and cure provision in the Builder Agreement because it makes no mention of that provision. According to the plaintiffs, this silence cannot be read to alter Centerplan's rights under the Builder Agreement because the term sheet does not conflict with the Builder Agreement. They further argue that rights to notice and an opportunity to cure must be expressly waived and that the term sheet's silence necessarily means the notice and cure provision still applies. The plaintiffs argue in the alternative that the language of the term sheet is ambiguous and, therefore, that the interpretation of the term sheet was a question of fact for the jury.

The city contends that, read naturally, the extended deadline contained in the term sheet was firm and that the city's right to replace Centerplan was absolute. In support of this contention, the city asserts that the purpose of a firm deadline was to ensure that at least some portion of the scheduled baseball season would be played in the stadium in 2016. The city further contends that Centerplan ratified and benefited from the term sheet. Finally, the city contends that, without the

_____

[13] The claim as articulated by the plaintiffs is: "[Did] the trial court err in treating DoNo and Centerplan as a single entity and thereby wrongly [strip] them of their legal rights?" However, the plaintiffs do not argue that the trial court erroneously treated DoNo and Centerplan as a single legal entity; rather, they argue that the trial court incorrectly interpreted the agreements between the parties.

Centerplan Construction Co., LLC *v.* Hartford

unqualified right to terminate Centerplan, the promise in the term sheet would be illusory and that the plaintiffs' defaults could not have been cured with more time.

We conclude that paragraph 2 (c) of the term sheet did not unambiguously eliminate Centerplan's notice and cure rights in the Builder Agreement. The question of whether the city breached the Builder Agreement by failing to provide Centerplan with the required notice and cure period was a question of fact for the fact finder, and both parties should have been permitted to introduce evidence regarding whether the city gave Centerplan notice and a cure period.

The following facts and procedural history are relevant to our resolution of this issue. Days before trial began, the city filed a motion in limine, asking the trial court to rule that Centerplan's and DoNo's claims of default on the basis of the city's failure to provide notice and a cure period were barred as a matter of law.[14] Specifically, the city argued that the term sheet modified the terms of the Developer Agreement and Builder Agreement, eliminating the cure period under certain circumstances. In response, the plaintiffs argued that the city was required to provide Centerplan with notice and an opportunity to cure prior to termination, that the term sheet did not bind Centerplan because Centerplan did not sign it, and that the only way the city could terminate Centerplan for failing to meet the substantial completion deadline was to terminate DoNo using the step-in provision in paragraph 8 of the Direct Agreement. The step-in provision would equip the city with DoNo's rights under that agreement, including the

---

[14] It is possible that this motion in limine was prompted by a question from an order of the trial court during a hearing on May 13, 2019. First, the trial court asked the parties whether the city could still prevail if it wrongly terminated Centerplan. The court then asked the parties to submit "all the legal conclusions that you would want [it] to incorporate into any contracts . . . ."

Centerplan Construction Co., LLC *v.* Hartford

power to terminate subject to applicable notice and cure requirements.

After a hearing, the trial court ruled, as a matter of law, that the city did not breach its agreements by terminating Centerplan without an opportunity to cure.[15] The trial court ruled that the term sheet superseded Centerplan's rights under the original contract documents and that the term sheet allowed the city to terminate and replace Centerplan without providing for a right to cure. The trial court emphasized that the term sheet explicitly preserved certain provisions of the Developer Agreement but that the notice and cure provision of the Builder Agreement was not among them. The term sheet, the trial court determined, "can't fairly be read to have required notice [and] cure rights . . . . Not only do the words used not provide for it, but keeping such rights would have frustrated the basic bargain in the term sheet. The term sheet gave Centerplan two months more time. In exchange, it provided that, if Centerplan didn't meet this extended deadline, it faced termination and higher liquidated monetary damages. If the new, two month extended deadline could be extended more by the rights to cure, the bargain would have been meaningless." Finally, the trial court reasoned that it "[does not] matter that DoNo signed the agreement, not Centerplan. Section 8.1.10 of Centerplan's agreement [with DoNo] requires Centerplan to comply with the 'terms, conditions, obligations and requirements' of the developer's contract, and the term sheet amended the developer's contract." We disagree with the position of the city and the trial court.

It is useful first to consider the parties' rights as they stood before DoNo and the city executed the term sheet.

---

[15] The trial court announced this ruling orally during a hearing on May 29, 2019, before the start of trial. The court issued a written decision on June 14, 2019, during the trial.

Centerplan Construction Co., LLC *v.* Hartford

Centerplan was not a party to the Developer Agreement. But in both the Builder Agreement and the Direct Agreement, Centerplan agreed to adhere to certain provisions of the Developer Agreement. The Developer Agreement defines "developer default" as consisting of ten different ways DoNo could default. The defaults relevant to this appeal are contained in paragraph 7 (b) of that agreement: paragraph 7 (b) (1) (i) (failure to construct the stadium in a "workmanlike manner"); paragraph 7 (b) (1) (iii) (failure to meet substantial completion deadline); and paragraph 7 (b) (1) (v) (failure to pay liquidated damages).

Paragraph 7 (c) of the Developer Agreement describes the city's remedies in the event of DoNo's default. Paragraph 7 (c) (1) provides that, if a developer default exists "beyond all applicable notice and cure periods, [the] city may take any one or more of the following remedial steps . . . ." Under paragraph 7 (c) (1) (i), those remedial steps include the city's right to terminate the Developer Agreement and the right to remove Centerplan after providing all applicable notice and cure periods. In the event of a developer default for failure to meet the substantial completion deadline under paragraph 7 (c) (1) (iii), "the city shall be entitled to liquidated damages only."

The Builder Agreement between DoNo and Centerplan contains a provision, § A.14.2.1, "Termination by the Owner for Cause," that lists specific reasons permitting DoNo to terminate Centerplan. Pursuant to that section, DoNo had the ability to terminate Centerplan for any "substantial breach" of the design-build documents, subject to notice and an opportunity to cure.[16] Under

_____

[16] "Substantial breach" is not defined in the Builder Agreement or the Developer Agreement. For purposes of this analysis, we assume, without deciding, that failure to meet the substantial completion deadline amounts to a substantial breach of the Developer Agreement. Section 8.1.10 of the Builder Agreement defines the design-build documents as including the Developer Agreement.

§ A.14.2.2, when one of the reasons for termination for cause arises, DoNo "may without prejudice to any other rights or remedies of the Owner and after giving [Centerplan] and [Centerplan's] surety, if any, seven days' written notice to cure, upon [Centerplan's] failure to cure, terminate [the] employment of [Centerplan] . . . ."

The Direct Agreement, signed by the city, DoNo, and Centerplan, contains a provision allowing the city to step into DoNo's shoes, replacing DoNo as a party to the Builder Agreement, but only in the event the city first terminated the Developer Agreement with DoNo. The Direct Agreement further provides that, until the city exercises this step-in provision, the "city shall have no direct rights under the [Builder Agreement] and shall not be considered nor is a party thereto." The Direct Agreement is the only contract between the city and both plaintiffs.

Prior to the term sheet, the Developer Agreement limited the city's remedy, upon the plaintiffs' failure to meet the substantial competition deadline, to liquidated damages. Thus, the only way the city could gain the right to terminate Centerplan for failing to meet the substantial completion deadline was pursuant to the Direct Agreement, which allowed the city to terminate DoNo and then step into DoNo's shoes for the purposes of the Builder Agreement. The city would thereby have all of the same rights and obligations DoNo had under that agreement, including the obligation to provide Centerplan with notice and an opportunity to cure before termination of the Builder Agreement.

Paragraph 14 of the four page term sheet provides: "All of the agreements between the city and [DoNo] (and [Centerplan], to the extent applicable) shall be amended to reflect the terms and conditions herein." The term sheet extended the substantial completion deadline from March 11 to May 17, 2016. Paragraph 2

Centerplan Construction Co., LLC *v.* Hartford

of the term sheet modified the Developer Agreement's provision for liquidated damages as follows: "If the Ballpark is delivered after the Substantial Completion Deadline and Liquidated Damages are triggered pursuant to the terms of the [Developer Agreement], the first day damages shall be \$50,000"; thereafter, "damages shall accrue at a rate of \$15,000 per day," and "[i]f the Substantial Completion Date is not attained, the city shall have the option to remove Centerplan . . . ."

A

When the trial court relies solely on the language of an agreement, which it determines to be plain and unambiguous, and when the parties disagree on the meaning of that language, "the first question that this court must address is not whether the trial court's substantive interpretation of the [agreement] was correct, but the more fundamental question of whether the relevant language was plain and unambiguous. . . . [T]hat determination is a question of law subject to plenary review." *Cruz* v. *Visual Perceptions, LLC*, supra, 311 Conn. 101. Similarly, interpretation and construction of an unambiguous contract is subject to plenary review. Id., 101–102. "A contract is unambiguous when its language is clear and conveys a definite and precise intent." (Internal quotation marks omitted.) Id., 102–103. By contrast, a contract is ambiguous if its language is susceptible to more than one reasonable interpretation. Id., 103. "[W]hen there are multiple writings regarding the same transaction, the writings should be considered together in construing the contract." (Internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, supra, 259 Conn. 671. "[When] two contracts are made at different times, but [when] the later is not intended to entirely supersede the first, but only to modify it in certain particulars, the two are to be construed as parts of one contract, the later superseding the earlier one wherever it is inconsistent." (Footnotes

omitted.) 17A Am. Jur. 2d 470, Contracts § 489 (2016); see also *Iowa Arboretum, Inc.* v. *Iowa 4-H Foundation*, 886 N.W.2d 695, 706 (Iowa 2016); *Prue* v. *Royer*, 193 Vt. 267, 283, 67 A.3d 895 (2013).

The term sheet modified the Developer Agreement, but its terms do not indicate that it is a substitute for either the Developer Agreement, the Direct Agreement, or the Builder Agreement. "A recognized test for whether a later agreement between the same parties to an earlier contract constitutes a substitute contract looks to the terms of the second contract. If it contains terms inconsistent with the former contract, so that the two cannot stand together it exhibits characteristics . . . indicating a substitute contract." (Internal quotation marks omitted.) *Alarmax Distributors, Inc.* v. *New Canaan Alarm Co.*, 141 Conn. App. 319, 331–32, 61 A.3d 1142 (2013); see *Riverside Coal Co.* v. *American Coal Co.*, 107 Conn. 40, 45, 139 A. 276 (1927); see also 2 Restatement (Second), Contracts § 279, comment (a), p. 375 (1981) ("A substituted contract is one that is itself accepted by the obligee in satisfaction of the original duty and thereby discharges it. A common type of substituted contract is one that contains a term that is inconsistent with a term of an earlier contract between the parties."). However, when a later modification does not supersede the primary contract but modifies only certain aspects of it, the later modification amends only those portions of the primary contract whenever the two are inconsistent. See 17A Am. Jur. 2d, supra, § 489, p. 470.

Here, the language of the term sheet itself makes clear an intent that certain provisions of the original Developer Agreement remain in place. In addition, paragraph 14 of the term sheet provides in relevant part that "[a]ll of the agreements between the city and [DoNo] (and [Centerplan], to the extent applicable) shall be amended to reflect the terms and conditions stated herein." It is therefore clear from the language

Centerplan Construction Co., LLC *v.* Hartford

that the term sheet modifies the agreements referenced in it to the extent the term sheet specifically provides; it is not a substitute contract that completely supersedes any of the underlying agreements.

One such modification included in the term sheet was a change to the liquidated damages provision of the Developer Agreement. Paragraph 2 of the term sheet modified the Developer Agreement's provision for liquidated damages by adding the following language: "If the Substantial Completion Date is not attained, the city shall have the option to remove [Centerplan] . . . ."[17] The term sheet does not list, by number, the precise provision or provisions in the Developer Agreement this paragraph modifies. However, it is clear from the Developer Agreement that the liquidated damages provision is paragraph 7 (c) (1) (iii). Therefore, paragraph 2 of the term sheet modified paragraph 7 (c) (1) (iii) of the Developer Agreement, which, as explained previously, limited the city's remedy for Centerplan's failure to meet the substantial completion deadline to liquidated damages. As modified, in addition to liquidated damages, the city gained the right to remove Centerplan in the event Centerplan failed to meet the substantial completion deadline, a right the city did not have under the prior agreements.[18]

B

It is clear that the term sheet provides the city with the right to remove Centerplan without first terminating DoNo under the step-in procedure contained in the

_____

[17] Paragraph 2 of the term sheet provides in relevant part: "If the Ballpark is delivered after the Substantial Completion Deadline and Liquidated Damages are triggered pursuant to the terms of the [Developer Agreement], the first day damages shall be $50,000"; thereafter, "damages shall accrue at a rate of $15,000 per day . . . ."

[18] Paragraph 2 (c) of the term sheet provides in relevant part: "If the Substantial Completion Date is not attained, the city shall have the option to remove [Centerplan] . . . ."

Direct Agreement if the substantial completion deadline is not attained. This does not answer, however, the question of whether Centerplan has a right to notice and an opportunity to cure under the term sheet. The term sheet is silent regarding whether the city's right to terminate is subject to any notice and cure requirements.

Although it is generally true that silence alone does not necessarily equate to ambiguity; see, e.g., 11 R. Lord, Williston on Contracts (4th Ed. 1999) § 30:4, pp. 47–51; the Appellate Court has held that silence or a lack of detail *may* amount to ambiguity. See *Stamford Wrecking Co.* v. *United Stone America, Inc.*, 99 Conn. App. 1, 11, 912 A.2d 1044, cert. denied, 281 Conn. 917, 917 A.2d 999 (2007); cf. *State* v. *Ramos*, 306 Conn. 125, 136, 49 A.3d 197 (2012) ("silence may render a statute ambiguous when the missing subject reasonably is necessary to effectuate the provision as written"). See generally *Salce* v. *Wolczek*, supra, 314 Conn. 686 (applying canons of statutory construction to interpret contract); *Karas* v. *Liberty Ins. Corp.*, 335 Conn. 62, 102–103, 228 A.3d 1012 (2019) (same). In *Stamford Wrecking Co.*, the Appellate Court considered whether a contract provision was ambiguous when it provided that the defendant "agrees to subcontract the abatement and demolition work to [the plaintiff] while retaining a certain portion of the work for its own forces pursuant to the [s]pecifications." (Internal quotation marks omitted.) *Stamford Wrecking Co.* v. *United Stone America, Inc.*, supra, 11. The court explained that "the agreement [was] silent regarding the precise amount of abatement and demolition work that was promised to the plaintiff and [the] overall percentage of work that would be allocated to each party," and that this lack of detail rendered the contract ambiguous. Id.

As in *Stamford Wrecking Co.*, the provision of the term sheet at issue in this case lacks key details. The term sheet provides that the city shall have the right

to "remove" Centerplan but does not establish any procedures for this removal—including whether any notice or cure period is required. Nor does it specify the precise nature of this right, including whether this right (1) imposes a new obligation on Centerplan by giving the city an unqualified right to terminate Centerplan while preserving DoNo's right to terminate Centerplan under the Builder Agreement (which would require Centerplan's ratification), or (2) is merely a conditional assignment to the city of DoNo's preexisting right to terminate Centerplan under the Builder Agreement and, thus, includes the accompanying notice and cure rights. We ultimately conclude that the term sheet is ambiguous as to whether the right to terminate is a newly created, unqualified right or an assignment of a preexisting right. Under either interpretation of the term sheet, however, Centerplan had some right to notice and an opportunity to cure: either an implied common-law right or a contractual right. As a result, for reasons we will explain in greater detail, we conclude that the trial court erroneously ruled that the term sheet did not, as a matter of law, require the city to provide Centerplan with notice and an opportunity to cure prior to termination.

The trial court interpreted the term sheet's silence regarding notice and the opportunity to cure as granting the city a new and unqualified right to terminate Centerplan and, thus, the notice and cure provision in the Builder Agreement did not control. This is one reasonable interpretation of the term sheet given its silence on this issue. This interpretation, however, provides the city with a right that did not exist under the prior agreements, namely, the right to terminate Centerplan for failing to meet the substantial completion deadline. It is axiomatic that, for the city to gain a new right over Centerplan, Centerplan had to be a party to the term sheet because, while a contract may provide benefits

to a third party, it cannot burden a third party that is a stranger to it. See, e.g., *Joseph General Contracting, Inc.* v. *Couto*, 317 Conn. 565, 578, 119 A.3d 570 (2015) (''[p]arties to a contract cannot thereby impose any liability on one who, under its terms, is a stranger to the contract, and, in any event, in order to bind a third person contractually, an expression of assent by such person is necessary'' (internal quotation marks omitted)). Because Centerplan did not sign the term sheet and, thus, was not bound to adhere to it by the terms of any other contract, Centerplan can be bound by the term sheet only if it ratified the term sheet. See part III D of this opinion. Whether Centerplan ratified the term sheet is a question of fact that the jury did not decide in the present case because of the trial court's incorrect ruling. See *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, 241 Conn. 546, 562, 698 A.2d 245 (1997).

Moreover, even if we assume that Centerplan somehow manifested assent to the term sheet, meaning that the Builder Agreement's notice and cure provision would not apply, the term sheet's silence regarding any notice and cure requirements does not mean that no such requirements exist. Our well established common law provides Centerplan with the right to notice and an opportunity to cure. Under our common law, when a contract is silent as to notice and cure rights, the right to cure is implied in every contract as a matter of law unless expressly waived. See *McClain* v. *Kimbrough Construction Co.*, 806 S.W.2d 194, 198 (Tenn. App. 1990), appeal denied, Tennessee Supreme Court (March 11, 1991); see also 5 P. Bruner & P. O'Connor, Construction Law (2014) § 18:15, p. 909. In the absence of specific language setting out a notice and cure period, the breaching party is generally entitled to notice and a *reasonable* time to cure the breach. See, e.g., *Fraunhofer-Gesellschaft zur Förderung der Angewandten Forschung E.V.* v. *Sirius XM Radio, Inc.*, 940 F.3d 1372,

Centerplan Construction Co., LLC *v.* Hartford

1379 (Fed. Cir. 2019) ("it is a general rule of contract law that a party exercising the right to terminate the contract must give notice within a reasonable time"); see also 5 P. Bruner & P. O'Connor, supra, § 18:41, p. 1001; 13 J. Perillo, Corbin on Contracts (Rev. Ed. 2003) § 68.9, pp. 258–62. Thus, under our common law, silence in a contract regarding notice and cure rights does not create ambiguity. Rather, it supports a presumption in favor of common-law notice and cure rights, and, at the very least, this silence does not support a conclusion that the term sheet *unambiguously* divests Centerplan of its notice and cure rights.

Because the term sheet is silent as to Centerplan's right to notice and an opportunity to cure, we conclude that there was no express waiver of this common-law right. This is true even if we assume, arguendo, that Centerplan was a party to or ratified the term sheet. The plain language of the term sheet cannot reasonably be interpreted as reflecting an intent to eliminate Centerplan's common-law notice and cure rights. Thus, even if the trial court was correct that the term sheet granted the city a new, unqualified right to terminate Centerplan, it incorrectly concluded that this right was not subject to any notice and cure requirements.

Although neither party briefed the issue, there is another reasonable interpretation of paragraph 2 (c) of the term sheet, which we discuss to further demonstrate the ambiguity of the provision. It would be reasonable to interpret the right the city gained under the term sheet as a conditional assignment of DoNo's right to terminate Centerplan under the Builder Agreement.[19]

_____

[19] "An assignment is a transfer of property or some other right from one person (the assignor) to another (the assignee), [that] confers a complete and present right in the subject matter to the assignee. . . . An assignment is a contract between the assignor and the assignee, and is interpreted or construed according to rules of contract construction." (Citation omitted; internal quotation marks omitted.) *Liberty Transportation, Inc.* v. *Massachusetts Bay Ins. Co.*, 189 Conn. App. 595, 602, 208 A.3d 330 (2019).

Specifically, if the substantial completion deadline is not attained, the term sheet requires DoNo to assign its right to terminate Centerplan under the Builder Agreement to the city. If the term sheet assigned this right to the city, the city's right was only as broad and unqualified as DoNo's right was under the Builder Agreement. See, e.g., *Shoreline Communications, Inc.* v. *Norwich Taxi, LLC*, 70 Conn. App. 60, 72, 797 A.2d 1165 (2002) ("[a]n assignee has no greater rights or immunities than the assignor would have had if there had been no assignment"). Thus, upon Centerplan's failure to meet the substantial completion deadline, the city gained the right to terminate Centerplan under the Builder Agreement without first having to terminate DoNo under the Direct Agreement. If paragraph 2 (c) of the term sheet operates as a conditional assignment, the city would still be required to adhere to the notice and cure provisions of the Builder Agreement prior to terminating Centerplan. Under this interpretation of the term sheet, which would not require Centerplan to be a party to the agreement because the Builder Agreement did not require Centerplan's approval for DoNo to assign its rights under the Builder Agreement, Centerplan clearly and unambiguously maintains its right to notice and a seven day opportunity to cure as provided by the Builder Agreement.[20]

[20] Alternatively, the plaintiffs argue that the city violated Centerplan's contractual rights by not following the step-in procedure in the Direct Agreement. To the extent the plaintiffs argue that this provision of the Direct Agreement requires the city to first terminate DoNo before it can terminate Centerplan—regardless of the reason or the other contractual provisions—the clear language of this provision, as discussed, does not create such a requirement but, rather, sets forth only the procedure for how Centerplan and the city would interact if DoNo were terminated. Because paragraph 2 of the term sheet creates a mechanism by which the city gains the right to terminate Centerplan without first terminating DoNo, the Direct Agreement would not be triggered by the city's exercise of its right under paragraph 2.

This conclusion does not conflict with the language of the Direct Agreement providing that, until the city steps into the shoes of DoNo under the Builder Agreement, the city "shall have no direct rights under the [Builder Agreement] and shall not be considered nor is a party thereto." This provision

Centerplan Construction Co., LLC *v.* Hartford

Both of these interpretations of the term sheet are reasonable, and we thus conclude that the term sheet is ambiguous as to whether paragraph 2 (c) grants the city a newly created right or requires DoNo to assign to the city its preexisting right to terminate Centerplan under the Builder Agreement. Regardless of this ambiguity, however, both interpretations of the term sheet entitle Centerplan to some form of notice and an opportunity to cure. Accordingly, the trial court improperly concluded, as a matter of law, that the city was not required to provide Centerplan with notice and an opportunity to cure prior to terminating Centerplan.

Nevertheless, the city argues that the term sheet clearly divests Centerplan of any right to notice and the opportunity to cure because, as the trial court stated, eliminating Centerplan's notice and cure period was necessary to preserve the basic bargain of the term sheet, which the trial court characterized as giving Centerplan two more months to complete the project in exchange for facing termination and higher liquidated damages if it did not meet this extended deadline. We disagree. Even with a notice and cure requirement (either under the common law or under the Builder Agreement), in exchange for granting Centerplan more time, the term sheet gave the city both (1) a right it did not have before unless it first terminated DoNo and stepped into its shoes, and (2) the right to higher liquidated damages. In addition, Centerplan was only entitled to either a seven day cure period (under the contract) or a "reasonable" time period (at common law).[21] Construing the

merely clarifies that the Direct Agreement does not grant the city any of DoNo's rights under the Builder Agreement until and unless the city terminates DoNo. It does not prevent DoNo from assigning its rights under the Builder Agreement to the city in a separate contract.

[21] We note that the city may still proceed with the theory it advanced at the first trial, which was that, even if Centerplan was entitled to a seven day notice and cure period, it would have been futile to give Centerplan the notice and cure period because it could not reach substantial completion by the end of any cure period. Our conclusions of law are limited to the interpretation of the parties' contracts.

Centerplan Construction Co., LLC *v.* Hartford

term sheet as not removing Centerplan's right to notice and a cure period does not prevent the city from obtaining the benefit of its bargain. Accordingly, we conclude that the trial court incorrectly concluded that the term sheet unambiguously removed the notice and cure provision from the Builder Agreement. Rather, the term sheet unambiguously provides Centerplan with some form of a right to notice and an opportunity to cure.[22] However, the term sheet is ambiguous as to whether the right to notice and the opportunity to cure is the contracted-for right in the Builder Agreement or a common-law implied right.

C

Nevertheless, the city contends in the alternative that, even if the trial court improperly construed the term sheet, any error is harmless and no new trial is warranted. Specifically, the city contends that the trial court's error was harmless because Centerplan cannot establish that it could have cured its breach before the end of the seven day cure period. The city's argument is more appropriately categorized as futility, which concerns whether a party could have cured its breach, rather than harmlessness, which concerns whether a trial court's error requires reversal of the judgment. The issue is whether it was futile for the city to give Centerplan the required notice and cure period (regardless of the nature of the right) because Centerplan could not reach substantial completion by the end of any cure period. As we will discuss in more detail, however, the burden is on the city, not the plaintiffs, to prove futility.

_____

[22] Although it is clear that the term sheet did not eliminate Centerplan's notice and cure rights, it is less clear what right, exactly, the term sheet did give to the city. During future proceedings, it may be necessary to determine whether the city's right to terminate Centerplan operates as a new and independent right, or whether it operates as an assignment of DoNo's existing right to terminate Centerplan.

Centerplan Construction Co., LLC *v.* Hartford

Clearly, the trial court's incorrect ruling affected the trial. Because the trial court determined that the term sheet gave the city an unqualified right to terminate Centerplan, it, in essence, held that the term sheet overrode any provisions from the prior agreements that qualified this right to termination. As discussed, however, the city could not terminate Centerplan without first providing some form of notice and opportunity to cure. To hold as the trial court did that this assignment altered Centerplan's rights would be to make a new or different agreement than that entered into by the parties. See, e.g., *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 374, 321 A.2d 444 (1973) ("[w]e assume no right to add a new term to a contract" (internal quotation marks omitted)). Thus, as a matter of law, Centerplan retained some right to notice and an opportunity to cure. The trial court's improper ruling prevented the parties from developing the record concerning—and the jury from considering—the factual issues of what type of notice and opportunity to cure was required, whether the city gave Centerplan the required notice and opportunity to cure and, if not, whether the city had a valid excuse for termination. Because the trial court's error prevented the parties from arguing key issues and removed questions of fact from the jury, a new trial is necessary. See *Cruz* v. *Visual Perceptions, LLC*, supra, 311 Conn. 106–108 (reversing judgment and remanding case for new trial when trial court failed to resolve ambiguity in parties' letter agreement by considering extrinsic evidence of parties' intent); see also *Chouinard* v. *Marjani*, 21 Conn. App. 572, 577, 575 A.2d 238 (1990) (new trial was required because "court's evidentiary ruling prevented the jury from considering relevant and material evidence affecting the ultimate issue" at trial).

The city's contention that the plaintiffs must demonstrate that they could have cured their breach to be

Centerplan Construction Co., LLC *v.* Hartford

entitled to a new trial misses the mark. "Termination of a construction contract can be upheld *only if the terminating party sustains its burden of proof* that . . . the terminating party terminated the contract in strict compliance with contractually specified termination procedures . . . ." (Emphasis added; footnotes omitted.) 5 P. Bruner & P. O'Connor, supra, § 18:39, p. 999. The city, therefore, has the burden of proving that it properly terminated Centerplan. Improper termination is itself a material contract breach. See, e.g., *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, 157 Conn. App. 139, 169, 117 A.3d 876 (failure to follow notice provision of termination clause invalidates termination and amounts to material breach of contract), cert. denied, 318 Conn. 902, 122 A.3d 631 (2015), and cert. denied, 318 Conn. 902, 123 A.3d 882 (2015). Further, "in the face of a property owner's repudiation or material breach of a construction contract, the contractor properly may exercise its right to seek contract damages, including lost profits, even if it has not substantially completed its own performance under the contract." Id., 161–62, citing 13 Am. Jur. 2d 107–108, Building and Construction Contracts § 112 (2009). Until the trial court's error is corrected and the ambiguous termination procedures are interpreted using extrinsic evidence, if any, it is impossible to determine whether Centerplan was properly terminated. If the city repudiated or anticipatorily breached its contract by wrongfully terminating Centerplan, the city may no longer be entitled to liquidated damages, and Centerplan may be able to seek damages regardless of whether it cured its own breach, unless the city has a valid excuse from performance. See *Martin* v. *Kavanewsky*, 157 Conn. 514, 518–19, 255 A.2d 619 (1969); *McKenna* v. *Woods*, 21 Conn. App. 528, 532, 534, 574 A.2d 836 (1990).

Examples of such excuses include futility and the incurability of the breach. The city could claim that

it was not required to give Centerplan notice and an opportunity to cure because to do so would be futile. See, e.g., *Semac Electric Co.* v. *Skanska USA Building, Inc.*, 195 Conn. App. 695, 718, 226 A.3d 1095, cert. denied, 335 Conn. 944, 238 A.3d 17 (2020), and cert. denied, 335 Conn. 945, 238 A.3d 19 (2020); see also 15 R. Lord, Williston on Contracts (4th Ed. 1990) § 43:17, p. 2. Similarly, when breaches are truly incurable, a cure notice may be unnecessary. See 5 P. Bruner & P. O'Connor, supra, § 18:15, pp. 910–11. The burden falls on the city, however, to demonstrate that providing notice and an opportunity to cure would be futile or that Centerplan's breach was incurable. The burden is not the plaintiffs' to show that Centerplan could have cured within the governing cure period. Notably, the Appellate Court has been reluctant to entertain a futility defense when the contract provided a specific notice and cure period and the terminating party did not honor that cure period. See *Semac Electric Co.* v. *Skanska USA Building, Inc.*, supra, 718 ("[w]e decline to speculate that waiting the additional hours required under the contract would have been futile").

Because the trial court did not properly construe the agreements and did not present this issue to the jury, the parties, particularly the plaintiffs, were prevented from developing the record regarding—and the jury was prevented from deciding—not only whether proper notice and an opportunity to cure were provided, but also whether honoring the termination requirements would be futile or whether Centerplan's breach was incurable. "We often have stated that whether a contract has been breached is a question of fact . . . and that this court lacks the authority to make findings of facts or draw conclusions from primary facts found." (Citation omitted.) *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, supra, 157 Conn. App. 171. In the present case, the trial court determined,

Centerplan Construction Co., LLC *v.* Hartford

before trial and as a matter of law, that the city could not
have breached its contract with Centerplan by failing
to give Centerplan notice of its default and an opportu-
nity to cure the default. The trial court's ruling was
premised on its incorrect construction of the term
sheet, which the trial court concluded unambiguously
eliminated Centerplan's notice and cure rights. As a
result of this pretrial error, the jury never was tasked
with deciding whether the city breached its contract
by failing to give Centerplan the required notice and
cure period before terminating the Builder Agreement.
It may be tempting to wonder whether an additional
seven days (or a reasonable time) would have made a
significant difference in the plaintiffs' ability to finish
the stadium on time. But we cannot make these determi-
nations as a matter of law, and this court cannot find
facts in the first instance. See, e.g., *Cruz* v. *Visual Per-
ceptions, LLC*, supra, 311 Conn. 106. This question must
be determined by the jury at a new trial on remand.

D

Because the issue of whether Centerplan ratified the
term sheet is likely to arise on remand, as referenced
in various portions of this opinion, we briefly address
the trial court's conclusion that it did not matter that
only DoNo signed the term sheet, and not Centerplan,
because "[s]ection 8.1.10 of Centerplan's agreement
[with DoNo] requires Centerplan to comply with the
'terms, conditions, obligations and requirements' of the
developer's contract, and the term sheet amended the
developer's contract." It is true that, when Centerplan
entered into the Builder Agreement,[23] it agreed to
adhere to certain terms of the Developer Agreement.
Centerplan, however, did not agree to be bound by

_____
[23] Although not a part of the trial court's reasoning, Centerplan also agreed
to be bound by certain other provisions of the Developer Agreement pursuant
to the terms of the Direct Agreement. The same reasoning applies to the
Direct Agreement.

Centerplan Construction Co., LLC *v.* Hartford

any future modifications to the terms of the Developer
Agreement. In the absence of an expression of an intent
by Centerplan to be bound by *future* modifications, we
decline to conclude that § 8.1.10 applies not to just
those terms of the Developer Agreement that were in
place at the time Centerplan signed the Builder Agree-
ment, but to those terms that came later in the term
sheet.[24] See *Gilmore* v. *Knights of Columbus*, 77 Conn.
58, 62, 58 A. 223 (1904) (holding that, when parties
expressly agree to be bound by future amendments to
contract, "the courts are substantially agreed that a
future amendment, if reasonable, binds the consenting
member"). Thus, because the term sheet was executed
only by DoNo and the city, Centerplan was not bound
by its terms. See, e.g., *FCM Group, Inc.* v. *Miller*, 300
Conn. 774, 17 A.3d 40 (2011) ("[T]he obligation of con-
tracts is limited to the parties making them, and . . .
in order to bind a third person contractually, an expres-
sion of assent by such person is necessary. . . . In
other words, [a] person who is not a party to a contract
(i.e., is not named in the contract and has not executed
it) is not bound by its terms." (Citation omitted; internal
quotation marks omitted.)). Id., 797.

The city contends that, even if the trial court erred
in ruling that § 8.1.10 of the Builder Agreement bound
Centerplan to adhere to the term sheet, Centerplan
remained bound by the term sheet because it knew of,
and acquiesced in, its terms and accepted its benefits.
In other words, the city argues that Centerplan ratified
the term sheet. This argument, however, must be

[24] Even if § 8.1.10 of the Builder Agreement did bind Centerplan to the
term sheet to some extent, that provision applies only to "terms, conditions,
obligations and requirements *pertaining to the design and construction of
the Project* . . . ." (Emphasis added.) The plaintiffs argue that notice and
cure rights do not pertain to the design and construction of the project,
and, therefore, the Builder Agreement does not bind Centerplan to the notice
and cure provisions of the Developer Agreement or any modifications to
those provisions caused by the term sheet. We agree.

addressed on remand only if the fact finder determines that paragraph 2 (c) of the term sheet grants the city a newly created right to terminate Centerplan for failing to meet the substantial completion deadline. See part III B of this opinion. If the fact finder determines that paragraph 2 (c) creates a conditional assignment to the city of DoNo's preexisting right under the Builder Agreement, ratification by Centerplan is not required for this provision to be enforceable. This is because an assignment of rights does not create any new obligations for Centerplan, and none of the prior agreements required Centerplan's permission for DoNo to assign its rights under the Builder Agreement. Cf. *Rumbin* v. *Utica Mutual Ins. Co.*, 254 Conn. 259, 268–69, 757 A.2d 526 (2000).

In the event the fact finder determines that paragraph 2 (c) of the term sheet grants the city a newly created right to terminate Centerplan for failing to meet the substantial completion deadline, however, we address this argument briefly. As explained in part III B of this opinion, under our interpretation of the term sheet, Centerplan would be subject to new obligations, thus requiring its consent. Because Centerplan did not sign the term sheet and was not bound by the term sheet under the terms of the Builder Agreement, it would have had to ratify the term sheet to consent to its requirements. See, e.g., *Joseph General Contracting, Inc.* v. *Couto*, supra, 317 Conn. 578 ("to bind a third person contractually, an expression of assent by such person is necessary" (internal quotation marks omitted)). Whether a party ratified an agreement is a question of fact. See *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, supra, 241 Conn. 562. This court is not permitted to make a finding of fact "unless the subordinate facts found make such a conclusion inevitable as a matter of law." (Internal quotation marks omitted.) *Reclaimant Corp.* v. *Deutsch*, 332 Conn, 590,

Centerplan Construction Co., LLC *v.* Hartford

614, 211 A.3d 976 (2019). Because the trial court made
no preliminary finding of fact regarding ratification,
and, indeed, it could not, the parties did not have the
opportunity to offer evidence on this issue. The record
is therefore not adequate for this court to determine
this issue. Thus, if the fact finder on remand determines
that the term sheet grants the city a new, unqualified
right to terminate Centerplan, even assuming there was
proper notice and an opportunity to cure, as required
under the common law, the fact finder also would have
to determine whether Centerplan ratified the term sheet
for the city to have properly terminated Centerplan.

In conclusion, we reiterate the following two conclu-
sions of law. First, under the contracts, the city plainly
and unambiguously maintained legal control of the
architect and stadium design, from the signing of the
original agreements in February, 2015, to the assign-
ment of the Architect Agreement in May, 2015. The city
also retained liability for the architect's errors during
this time period. Second, from the assignment of the
Architect Agreement in May, 2015, to January, 2016,
when the term sheet was executed, the plaintiffs plainly
and unambiguously had legal control of the architect
and stadium design.

On remand, the fact finder must decide the following
questions of fact, among others that are otherwise
within the province of the jury. First, the fact finder
must determine whether Centerplan ratified the term
sheet. If the fact finder determines that Centerplan did
in fact ratify the term sheet, the scope of trial as to
Centerplan is limited to claims that arose after the exe-
cution of the term sheet in January, 2016. Second, the
fact finder must determine the extent of legal control
of the architect and stadium design from the time the
term sheet was executed in January, 2016, until the city
terminated its contractual relationship with Centerplan
and DoNo in June, 2016. Third, the fact finder must

determine whether the parties intended that the term sheet grant the city, through its right to terminate Centerplan's contract, a newly created, unqualified right or an assignment of a preexisting right. Fourth, the fact finder must determine whether the city breached its contract by failing to provide Centerplan with the required notice and cure period before terminating the Builder Agreement.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.

———————————————